**Don Carlos FORD, Plaintiff,**

**v.**

**Brenda Dianne FORD, Defendant.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

Nov. 19, 1996.

Application for Permission to Appeal
Denied by Supreme Court
July 14, 1997.

Rex L. Brasher, Ronald L. Harper, Brown, Brasher & Smith, Memphis, for Plaintiff.

Kay Farese Turner, Charles W. McGhee, Turner & McGhee, Memphis, for Defendant.

HEWITT P. TOMLIN, Jr., Senior Judge.

Don C. Ford ("Husband") filed suit in the Circuit Court of Shelby County against Brenda D. Ford ("Wife") seeking a divorce on the grounds of either irreconcilable differences or inappropriate marital conduct. Wife filed a counter complaint seeking a divorce on the grounds of inappropriate marital conduct and adultery. At trial the parties stipulated to inappropriate marital conduct on the part of husband, who also had previously admitted to one or more acts of adultery in his pretrial deposition. Following a bench trial the court awarded wife the divorce. The court also proceeded to divide the parties marital property, directed husband to pay wife alimony *in futuro* and at the same time directed husband to pay a part of wife's attorney fees, as well as requiring him to maintain certain hospitalization and life insurance for a specified term. Husband has raised four issues on appeal: whether the trial court erred in: (1) failing to make an equitable division of the marital property pursuant to T.C.A. § 36–4–121; (2) awarding wife alimony *in futuro* rather than rehabilitative alimony; (3) awarding wife attorney fees in the amount of $2,500.00; and (4) relying upon extrajudicial personal experiences rather than adhering to the evidence. In addition, wife has requested damages for an alleged frivolous appeal. For the reasons hereinafter stated, we modify and affirm the judgment of the trial court and also find that husband's appeal is not frivolous.

Many of the facts are undisputed. The parties were first married in May, 1966. At that time wife was 17 years old and husband was 21. Two children were born of the marriage, a son in 1969 and a daughter in 1972. Both children have finished college and are now residing outside the home. The parties were divorced in 1984, but later remarried in the latter part of 1985. The parties again separated in October, 1991 and have lived separate and apart since that time.

## I. The Distribution of Marital Property

■ In divorce or separate maintenance cases our legislature has provided that the courts must equitably divide the marital property of the parties. It is husband's contention that in the case at bar, the trial court made an inequitable distribution, with a larger percentage of the parties property going to wife. It is husband's contention that the marital assets should be divided equally between them. An equitable division, however, is not necessarily an equal one. *Barnhill v. Barnhill*, 826 S.W.2d 443, 449 (Tenn.App. 1991). The *Barnhill* court set out the applicable standard of review to be followed by an appellate court in examining a trial court's distribution of marital property:

> Trial courts are afforded wide discretion in dividing the interests of parties in jointly owned property. Accordingly, the trial court's distribution will be given great weight on appeal, and will be presumed to

be correct unless we find the preponderance of the evidence is otherwise.

*Id.* at 449.

The appellate courts of this state are inclined not to disturb a trial court's division of marital property unless they find that the distribution lacked proper evidentiary support or results from either an error of law or a misapplication of the statutory requirements. *Thompson v. Thompson,* 797 S.W.2d 599, 604 (Tenn.App.1990). Our scope of review in a case such as this is pursuant to T.R.A.P. 13(d), wherein it states that this court is to review an appeal from the lower court *de novo* upon the record, with findings of fact in that court being presumed to be correct, unless we find that the evidence preponderates against them. Husband contends that inasmuch as the trial court did not make any specific findings of fact as to this issue there is no presumption of correctness that would normally otherwise apply. This sub-issue is hotly contested by the parties. While the court did not make specific findings of fact the statements made by the court from time to time regarding the division of marital property could be considered by this court as findings of fact. Nonetheless, this contention only affects the existence and subsequent applicability of a presumption of correctness, which is applied if the evidence is in equipoise. The evidence in this case is of such a nature that the presumption will not be a factor.

T.C.A. § 36–4–121(c) sets forth the criteria which the courts of this state should consider in making an equitable distribution of marital property:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training, or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation or dissipation of the marital or separate party, including the contribution of a party to the marriage as homemaker, wage earner, or parent;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax circumstances to each party; and

(10) Such other factors as are necessary to consider the equities between the parties.

Husband valued the marital property in his Rule 14 Affidavit at $206,000.00. In her Rule 14 Affidavit, wife valued the property at $206,152.36. The trial court evaluated the property at $206,552.36.

Husband's proposal gave wife 65.4% of the marital assets with him retaining 34.6%. The court in dividing the property gave husband 31% of the property with wife receiving 69%. The division of marital property proposed by the wife was essentially the same as that proposed by husband. In reading the portion of the record relative to the division of property, the court also noted very little differences of opinion voiced by counsel. While it is true that in husband's overall settlement proposal he offered to pay wife rehabilitative alimony for a period of 3 years in the amount of $1,250.00 per month, at no time until following the conclusion of the trial court's decree did counsel for husband contend that the proposed division of property submitted by him was contingent upon the court awarding rehabilitative alimony as proposed by husband. In looking at the evidence presented to the court we are of the opinion that there was ample evidence in the record to support this division and that the evidence does not preponderate against this award.

The parties were married for twenty-eight (28) years. Wife has a high school education, husband has a college degree. Wife has a sporadic history working primarily part-time

jobs, principally in the clerical field. There is a great discrepancy in their respective earning capacities.

There was undisputed testimony that wife made contributions to the marriage as homemaker. Husband testified that she was a good wife during the marriage and was a good homemaker and mother to the children. In addition, husband's ability to replace the marital assets is much greater than that of wife.

While husband contends that the trial court obviously considered the issue of fault in dividing the marital property, husband fails to cite to any portion of the record that would sustain such an allegation. By the same token, husband contends that based upon this record the court should have divided the property equally between the parties as an equitable distribution. Here again, husband fails to cite to any part of the record to support this contention. Accordingly, we find this issue to be without merit.

## II. The Awarding of Alimony *In Futuro*

Husband contends that the trial court was in error in awarding wife alimony *in futuro* rather than rehabilitative alimony. The trial court ordered husband to pay alimony *in futuro* to wife on the following sliding scale: $1,800.00 a month for the first two years; $1,500.00 a month for the following three years, and, thereafter $1,000.00 per month. The cessation of these alimony payments would take place upon either the death or remarriage of wife.

Until recent years, like most other states, Tennessee has viewed the payment of alimony as the recognition of a husband's common law obligation to support his wife or as compensation for the wife's contribution to the marriage. *Cranford v. Cranford,* 772 S.W.2d 48, 50 (Tenn.App.1989). At the present time this state has moved away from the older concepts of alimony to the concept of "rehabilitative alimony." T.C.A. § 36–5–101(d) states:

It is the intent of the general assembly that a spouse who is economically disadvantaged relative to the other spouse be rehabilitated whenever possible by the granting of an order for payment of rehabilitative, temporary support and maintenance.

However, rehabilitative alimony is offered as an alternative to alimony *in futuro*, not as a replacement. Section 36–5–101(d) still permits the courts to award long-term support until remarriage or death of the spouse being cared for if it appears that rehabilitation is not feasible. Accordingly, our domestic relations laws governing the payment of alimony still acknowledges that:

"The husband, having entered one of the strongest most fundamental relationship known to the law, must continue to bear its financial burden where he can reasonably do so and where it is necessary in order to prevent a relatively greater hardship to the wife."

H. Clark, *The Law of Domestic Relations in the United States* § 17.5 at 255 (2nd Edition 1987).

 "The amount of alimony to be allowed in any case is a matter for the discretion of the trial court in view of the particular circumstances." *Ingram v. Ingram,* 721 S.W.2d 262, 264 (Tenn.App.1986). As stated by our supreme court in *Aaron v. Aaron,* 909 S.W.2d 408 (Tenn.1995), the real need of the spouse seeking the support is the single most important factor. In addition to the need of the disadvantaged spouse, the courts most often consider the ability of the obligor spouse to provide support. *See Cranford v. Cranford,* 772 S.W.2d 48, 50 (Tenn.App.1989). Furthermore, the amount of alimony decreed should be sufficient so "that the party obtaining the divorce [is not] left in a worse financial situation than he or she had before the opposite party's misconduct brought about the divorce." *Shackleford v. Shackleford,* 611 S.W.2d 598, 601 (Tenn.App.1981).

In this case husband at the time of trial was vice-president of operations of a steel company. For the years 1991–1994 husband's annual income was as follows: $77,937.00; $84,450.00; $91,790.00; $91,700.00. Husband's net income monthly after taxes in 1994 was $5,007.00 while his monthly expenses in that year averaged $2,457.35. On the other hand, as already noted, wife married husband right out of high school, which

except for a nine month business course some 20 odd years ago, is the sum total of her education. During the early part of her first marriage to husband, wife worked three days a week as a part-time employee, making $5.50 per hour in a sales capacity. After the separation of the parties in 1991, following the second marriage, she worked part-time at an eye clinic, earning slightly more than that. Her work experience throughout her career, to the extent that she has worked, has been in the clerical field. She has no training that would allow her to obtain a higher paying job. At the time of the trial below, wife anticipated the possibility of being employed at the eye clinic in Memphis full-time, should the opportunity develop. She was paid $5.50 per hour when she began her employment there and was making $7.50 per hour at the time of the trial. As a part-time employee she has no opportunity to be placed under any retirement plan or a health/hospitalization insurance plan.

For a substantial portion of the period of separation, during part of which time the parties' younger child was in residence with wife, husband voluntarily paid to wife as "maintenance" for her and their children two thousand ($2,000.00) dollars to two thousand two hundred ($2,200.00) dollars per month. For several months prior to the divorce, during which time both children had permanently moved out of the home, husband voluntarily reduced that to one thousand ($1,000.00) dollars per month.

Husband contends that the trial court failed to make a threshold determination that wife was not subject to rehabilitation prior to awarding her alimony *in futuro*. While the trial court did not make a specific findings and identify it as such, we think that nonetheless the trial court did make such a finding, as reflected by these remarks:

THE COURT: How this lady feels that she's now going to go off into a world of her own, she's going to—she's always has a strong right arm there, primary earner of her family, and it's been—and for no—what she considers certainly no reason of hers she's now going to be thrust out into the working day work at an age when great progress in earnings is pretty tough.

This fellow understands that also. He says maybe she should go back here and be a whatever, ophthalmologist or optometrist, but she can't in my judgment. If she could, it would cost a bundle, maybe as much as we're talking about for five years. I don't know.

But in addition to what she's making—of course, because she can't earn the money and go to optometry school. She might learn something about optometry and she might learn more than she knows about lenses and so forth and so on, but she won't be able to be an optometrist in my judgment without going back to school and then going over here and competing with these twenty-two year old recent college graduates. It's just too tough.

MR. BRASHER: Judge, we weren't even offering that.

THE COURT: I understand. What I'm saying is that—I'm just—what I'm seeking in her case is not something I particularly like to see, but I see a very tough time for her to make a lot of progress. You know, we've got twenty-five year old lady that can jump over here and go to two years of nursing school and I slap her heavy load on this fellow who is working and she's worked hard to send him through school and I say, look, you're going over here now and you'll have enough money to go to school and this and that and the other and take care of your baby and all and get out of nursing school, be a nurse, and after three years it's gone.

I like that. I mean, that's the way it ought to be. People ought to be able to get out and get on their own and so forth. After a marriage of this duration and after—I mean, this lady came out of Jonesboro, Arkansas. She worked—apparently either was taking care of children or doing some kind of part-time work throughout this marriage.

Now, she's not going to be a heavy money maker. She's just not going to be. The difference between this lady and her husband is astronomical in terms of earning capacity. This man may become the president of this corporation and who knows what? He may be in the three hundred

thousand. We don't know. We can't—we're not basing anything on it, but he's got that kind of potential. You can see from the way he carries himself, his demeanor. He's a—he's good. She's not going to do that.

Now, I understand he's got a new life and all those expenses, and I'm sure that his bride to be or whatever is just unhappy as she can be about the prospect of having checks written to this lady for life. I mean, that's just overwhelming.

I've been on all sides of this very issue. I don't favor long term alimony. I don't think that it's the thing the legislature favors. I don't favor it in my own feelings about it. If I could put the person—educate them and send them out to make their money and see in the future if they're willing to put the shoulder to the wheel and going to be—they're going to turn their life around and be able to live the normal life that they were living, that's fine. I'd do it.

Mr. Brasher, I'm not sure I can see that yet in the picture, and I don't see really that your man sees it. He doesn't say, look, let's give her four thousand a month for two years and let her become a nurse practitioner or whatever. Then she can make twenty-five thousand dollars a year. I don't think he thinks that that's going to be the future for her or should even be the future for her.

He knows, and it's always been this way, that she's kind of worked as a secretarial person that you see in a million offices all over the world. She's not just a stenographer. She's not the supersecretary. She's not the hundred and whatever it is forty words a minute person. She's the one that keeps the books on the one hand, answers the phone, takes the—makes the—makes the appointments, takes care of business.

She kind of does the job in the office that nobody ever really wants to do, and he's right. She is attractive. She's personable, and she'll do the type of job and do it well and get this full time deal and make more money at it and get raises. There is no doubt about that.

But after this man drops this money off and now we see her over here making whatever her income would be at best, because of him saying farewell, I found another somebody or we weren't able to work it out, whatever he's saying, she's going to be down to poverty row, and I don't know that I can see that. I just—I don't know that he really wants to see that. So he says, well, fifteen hundred for five years, but at the end of five years where is she going to be? It's going to be the same thing it is today in my judgment, a little better, five days a week but then she'll have this insurance maybe to pay and then she'll have this to pay.

■ Furthermore, we are constrained to note that fault may be considered a factor in the fixing of spousal support. *Luna v. Luna,* 718 S.W.2d 673, 675 (Tenn.App.1986). There is nothing specific in this record to reflect upon any domestic misfeasance or malfeasance by wife, either in the marriage just ended by this divorce or the prior marriage that was ended by divorce in 1984. On the other hand, it seems clear to this court that a persistent pattern of marital infidelity on the part of husband led to the breakup of the parties first marriage, and not withstanding an expressed uncontradicted commitment by wife as well as by husband that the second marriage was "forever", in the brief period just prior to the parties' separation in 1991 to the time of trial, husband had engaged in not one but two extramarital affairs. At the time of the trial, husband was sharing his conjugal nest with a thirty-eight year old young woman with whom he had been involved for over one year.

■ We conclude that the trial court did not err in awarding wife alimony *in futuro,* conditioned to terminate upon the death of one of the parties or wife's remarriage. Alimony *in futuro* is based, as noted, upon need, along with the ability to pay. There is no question about husband's ability to pay. The need of the wife is as expressed to the trial court in the record through her Rule 14 statement of income and expenses enlarged upon and supported by her testimony. The fixing of alimony *in futuro* is based upon these known factors known at the time of the

hearing. While there may be a change in circumstances in the future, it is speculation on the part of the trial court to ascertain at that time that in a specified period in the future wife's needs will decrease, and to what extent they will decrease.

In making his ruling, the trial court noted that some of the items on wife's Rule 14 Affidavit were perhaps a bit high. In reading the record this court is of the opinion that wife's testimony, as brought out by both direct and cross-examination, does not support the full amount of those items relative to church tithes, personal entertainment, and to some extent miscellaneous expenses. We are of the opinion that wife's alimony *in futuro* should be set at one thousand four hundred and fifty ($1,450.00) per month, to be terminated upon either death or remarriage of wife.

### III. Attorney Fees

Husband contends that the trial court was in error in directing him to pay the sum of two thousand five hundred ($2,500.00) dollars towards wife's attorney fees. Attorney fee awards are considered as alimony. *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. App.1988). The awarding of attorney fees lies within the sound discretion of the trial court, and unless we find that the evidence preponderates against such an award, we will not disturb it on appeal. *Storey v. Storey*, 835 S.W.2d 593, 599 (Tenn.App.1992). This record reveals that the two thousand five hundred ($2,500.00) dollars awarded is not a substantial portion of the total attorney fees wife is obligated to pay her lawyer. It is this court's reaction that the total amount being charged was a reasonable one. The background of this award is as follows: for some unexplained reason wife had not identified a particular checking account of hers, which contained five thousand ($5,000.00) dollars. The trial court proceeded with no objection from husband's counsel to evenly divide this account between husband and wife and allocated husband's portion to wife's attorney fees. Upon considering the relative financial position of the two parties, including but not limited to the ability of each party to increase their assets and their respective earning

power, we are of the opinion that the evidence does not preponderate against this alimony award. Accordingly, this issue is without merit.

### IV. Any Judicial Prejudice

Husband contends that in several aspects of the trial court's ruling the trial judge relied upon his personal experiences, extrajudicial in nature, rather than following the evidence set forth in the record. Specifically, husband contends that the trial court drew upon its personal experience of having been married three times in determining the outcome of the case at hand. In this husband is mistaken. The trial court's reference to its three previous marriages dealt with an issue regarding the possible cessation of alimony upon husband's receipt of social security. The court's comment in this regard was as follows:

> I don't deal in these things often. I know that at one time I had been married three times, and all three of them were going to draw my social security. I don't know what that meant, but it opened my eyes to whatever the Federal Government has, some kind of program where all wives can get in line and draw the same amount. How they can do it I don't know. . . .

This issue is without merit. Lastly, we are also of the opinion that husband's appeal is not frivolous.

The judgment of the trial court is affirmed as modified. Costs in this cause on appeal are taxed ⅞th's to husband and ⅛th to wife, for which execution may issue if necessary.

CRAWFORD and FARMER, JJ., concur.