IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
April 9, 2003 Session

# BRIAN C. MAYES  v.  RONALD R. LEMONTE, JR.

**Appeal from the Circuit Court for Montgomery County**
**No. 50100051     John H. Gasaway, III**

---

**No. M2002-00625-COA-R3-CV - Filed June 6, 2003**

---

In this dog bite case, the trial court awarded a meter reader $5000 in compensatory damages against the dog owner.  The dog owner claims on appeal that he was not negligent in handling his dog and that the sitting trial judge was biased and prejudiced against him.  We affirm.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed and Remanded**

RUSS HELDMAN, SP. J., delivered the opinion of the court, in which BEN CANTRELL, P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Ronald R. LeMonte, Jr., Clarksville, Tennessee, *Pro Se.*

Brian C. Mayes, Clarksville, Tennessee, *Pro Se.*

## OPINION

On January 17, 2001, the Montgomery County General Sessions Court awarded Brian C. Mayes $3000 in compensatory damages for a dog bite which Ronald R. LeMonte's, Jr. dog, Blackie, inflicted on Mayes' ankle on May 17, 2000.  LeMonte took a *de novo* appeal to the Montgomery County Circuit Court, which found in favor of Mayes and awarded him $5000 in damages on December 13, 2001, after a bench trial.

In this *pro se* appeal, LeMonte raises two issues before this Court. First, he claims the Trial Court was biased and prejudiced against him and therefore the judgment should be reversed and a new trial granted. Second, LeMonte contends Mayes did not prove he was negligent, thereby exonerating him from any liability.  We will address these issues in reverse order.

The following facts are undisputed by the parties.  On May 17, 2000, Mayes entered LeMonte's fenced-in yard in order to read the meter, as was his profession with the Clarksville Gas and Water Department.  When Mayes approached the fence, LeMonte's three dogs were barking and

growling. A picture of the fence shows LeMonte prominently displayed a "Beware of the Dog sign." Mayes asked LeMonte whether the dogs would bite. He answered that they would not. Unconvinced, Mayes requested LeMonte hold the black dog before he entered and while he read the meter. According to Mayes, Blackie "was acting strange." Recognizing that all the dogs were acting more aggressive than usual, LeMonte agreed to hold Blackie.

Subsequently, Mayes entered the yard and began reading the meter. As Mayes read the meter, Blackie bit Mayes' ankle. Mayes' injuries from the bite required serious medical attention.

The only significant disputed fact in this case is whether LeMonte even told Mayes to stay out until Blackie was put into a pen. Mayes testified LeMonte had hold of Blackie and clearly motioned with his hand to enter the yard after he had hold of the dog. LeMonte asserted he did not have hold of Blackie and that he held up his hand in a motion to stop Mayes so he could grab Blackie and then put the dog inside a pen. Neighbor Mike Flood testified he saw someone holding up his hand in a stopping motion but was unaware of the identity of the individual.

The trial judge apparently accepted Mayes' testimony that LeMonte invited him in before the dog could be penned, which was as follows:

"I first explained who I was and said I needed to read the water meter. I told him I needed to come in the fence. I also asked if the dogs would bite. He told me the dogs would not bite. I still wasn't convinced because the black lab, which was the dog that bit me, was growling and jumping on the fence with his hair sticking up. I knew this dog was acting strange, so I asked him if he could hold the dog while I came in the fence, so he held the dog. He told me to come on in. I opened the fence, came in and read the meter. As I was bent over reading the meter, the dog bit me on my right leg in between my calve and my ankle."

Concerning a pen to contain the dog, LeMonte admitted that he and his father had built a pen for all the dogs. There was also a "Beware of the Dog" sign. It is clear from LeMonte's own testimony that he knew the pen was available and that he believed the dog, Blackie, should have at least have been penned-up before Mayes entered and read the meter. In fact, the testimony is replete with references to how threatening Blackie was acting while Mayes was outside the fence. Mayes testified that Blackie "was growling and jumping on the fence with his hair sticking up," that Blackie "was acting a lot more aggressive than the other two dogs," and that Blackie "was acting strange." LeMonte himself testified Blackie was "barking and growling" and all the dogs were "acting more aggressive than usual."

Tenn. R. App. P. 13(d) establishes that this Court shall conduct a de novo review of findings of fact by the trial court in a non-jury trial, with the trial court's findings accompanied by a presumption of correctness, unless contrary to the preponderance of the evidence.

If the trial judge has not made a specific finding on a particular issue, this Court reviews the record to determine where the preponderance of evidence applies without applying a presumption of correctness. *Devorak v. Patterson*, 907 S.W.2d 815, 818 (Tenn. App. 1995).

We also note that, as a general rule, this Court does not pass on the credibility of witnesses. The trial court, having seen and heard witnesses testify, is in the best position to determine their credibility. Implicit in the trial court's judgment are determinations of witness credibility. *Bowman v. Bowman*, 836 S.W.2d 563, 566 (Tenn. App. 1991). Since the trial court is in the best position to observe the witnesses and to assess their demeanor, this Court will not reevaluate the trial court's assessment of witnesses' credibility in the absence of clear and convincing evidence to the contrary. *Wells v. Tennessee Bd. of Regents*, 9 S.W. 3d 779, 783 (Tenn.1999).

Accordingly, this Court therefore must accept that LeMonte invited Mayes into the fenced-in area before he had securely placed the dog into the pen.

With respect to the keeping of domestic animals, the applicable law has been stated as follows:

> "The owner or keeper of domestic animals is liable for injuries inflicted by them only where he has been negligent, the animals were wrongfully in the place where they inflicted the injuries, or the injuries are the result of known vicious tendencies or propensities. A person has a right to own or keep domestic animals of any kind provided they are so restrained as to not expose others engaged in their ordinary or lawful pursuits to danger. The owner or keeper of a domestic animal is bound to take notice of the general propensities of the class to which it belongs, and also of any particular propensities peculiar to the animal itself of which he has knowledge or is put on notice; and in so far as such propensities are of a nature likely to cause injury he must exercise reasonable care to guard against them and to prevent injuries which are reasonably to be anticipated from them."

*McAbee v. Daniel*, 445 S.W.2d 917, 923 (Tenn. App. 1968).

We believe this case is governed by general negligence principles, not that aspect of dog bite law which imposes liability on an owner where there are "injuries resulting from known vicious tendencies or propensities." *Id.*

"A duty rests on everyone to use due care under the attendant circumstances, and negligence is doing what a reasonable and prudent person would not do under the given circumstances." *Dixon v. Lobenstein*, 132 S.W.2d 215, 216 (Tenn. 1939); *Dooley v. Everett*, 805 S.W.2d 380, 383 (Tenn. App. 1990).

We conclude that a reasonable and prudent person in LeMonte's circumstances would not have invited Mayes in to read the meter until after insuring that Blackie was put away. The evidence

preponderates in favor of this conclusion. Accordingly, LeMonte was negligent and the Trial Court was justified in assessing damages for such negligence.

The next issue is directed toward the alleged bias and prejudice of the trial judge towards LeMonte. A trial judge should be disqualified when "the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding." *Caudill v. Foley*, 21 S.W.3d 203, 214 (Tenn. App. 1999).

"Bias and prejudice are only improper when they are personal. A feeling of ill will or, conversely, favoritism towards one of the parties to a suit are what constitute disqualifying bias or prejudice….Despite earlier fictions to the contrary, it is now understood that judges are not without opinions when they hear and decide cases. Judges do have values, which cannot be magically shed when they take the bench."

*Id. See also*, *Wilson v. Wilson*, 987 S.W. 2d 555, 562 (Tenn.App. 1998), as follows:

Bias or prejudice in the disqualifying sense must stem from an extrajudicial source and not from what the judge hears or sees during the trial. *Id.* (Quoting *State ex rel. Wesolich v. Goeke*, 794 S.W. 2d 692 (Mo. App.1990); *Jack Farenbaugh and Son v. Belmont Const. Inc.,* 194 Cal.App.3d 1023, 240 Cal.Rptr. 78 (1987)). Otherwise, any judge that makes a ruling adverse to one party would be open to a charge of bias. In addition "impersonal prejudice resulting from the judge's background experience does not warrant disqualification." *Alley v. State*, 882 S.W. 2d at 821 (Tenn.Crim.App.1994). Most trial judges, we suspect, have strong feelings about certain types of behavior or conduct. When the judge perceives that one party or the other has engaged in that conduct, the party should not be surprised that he/she has incurred the judge's wrath.

LeMonte, who was also representing himself at trial, lists the following reasons why he claims the trial court judge was biased and prejudice against him: 1) The trial judge was contacted by the trial attorney for Mayes before trial and informed of LeMonte's "defense strategy." 2) The trial judge accepted legal precedent (an appellate court opinion) submitted to him by the attorney for Mayes and did not accept or even "look at" LeMonte's legal precedent (four appellate court opinions). 3) The trial judge refused to hear testimony from LeMonte's witnesses who did not witness the dog bite incident but who could testify about the dog's "behavioral history." 4) The trial judge rested his decision on the testimony of Mayes' witnessess. 5) The Circuit Court judgment of $5000 was greater than the General Session Court's judgment of $3000.

We find these claims to be without merit. Mayes has cited to no place in the record to show that there was any improper *ex parte* communication about "defense strategy" between the trial judge and the lawyer for Mayes. "This court has held on several occasions that where a party in its brief on appeal has advanced certain arguments or has set forth what he or she alleged to be facts without any citation to the record, this court is not under a duty to minutely search the record to verify these unsupported allegations." *Long v. Long*, 957 S.W.2d 825, 828 (Tenn. App. 1997). This Court

cannot assume an impropriety has occurred which is totally unsupported by anything in the Trial Court record.

Concerning consideration of certain legal precedent, the record shows the Trial Court received LeMonte's dog bite opinions during the trial and told both sides that they could "argue that law later." There was closing argument and the trial judge ruled from the bench. There is nothing in the record remotely to suggest that the trial judge did not consider LeMonte's legal authorities. This Court is not aware of any rule which would require the trial judge to consider any specific legal authorities in the form of any certain appellate court opinions. All that is required is that the trial judge apply applicable law to the facts based upon the preponderance of the evidence standard and the trial judge's determination of the credibility of witnesses. That was done in this case and not done in a biased or prejudicial way.

The trial judge did not do anything improper by failing to consider the testimony of witnesses who were not present to witness circumstances pertaining to the dog bite the day it happened. LeMonte was told the following by the trial judge before LeMonte began to present his defense:

> "You can put on evidence now, but it's going to have to be restricted. It's not about what everyone thinks about your pet, what they thought about the dog, whether it was vicious in the past, or whether it was the most gentle animal they've ever seen. That's not the issue. The issue is how you did handle your pets that day. Were you negligent or not? So if you got witnesses standing there watching what happened, that's fine, but if you got witnesses who want to talk about the dog and how they acted in the past, I'm not going to hear that because that's not the issue. The issue is whether you're negligent or not in the way you managed your dogs that day. All right, call your first witness."

The trial judge's statements to LeMonte were based upon a correct understanding of applicable law. It was within his discretion to give the *pro se* litigant advance notice of the fact that testimony about "behavioral history" was irrelevant to the ultimate determination, that is, whether LeMonte was negligent in his handling of Blackie. This is especially true in this case. Before LeMonte was told by the trial judge about the limitation on witnesses, LeMonte had already testified as Mayes' witness that he had received no prior complaints "in reference to aggressiveness or viciousness" of any of his dogs. Apparently, the trial judge was indicating to LeMonte that since Mayes had no negative "behavioral history" about the dogs to offer during his case in chief, it was not necessary for LeMonte to attempt to rebut that fact. Under the circumstances, we find nothing improper in what the trial judge did, certainly nothing which demonstrates a personal bias or prejudice against LeMonte.

Again, we defer to the trial judge on his assessment on the credibility of the witnesses. *See Bowman*, 836 S.W.2d at 566. Therefore, it was proper for him to render judgment in favor of Mayes based upon the testimony of the witnesses called by Mayes, that is, LeMonte, Mayes himself and a witness to the ankle damage "within minutes of injury." This issue cannot support any claim of bias and prejudice of the trial judge against LeMonte.

Finally, the trial judge was not bound by any rule from awarding a larger judgment against LeMonte as was awarded by the General Sessions Court below. The appeal was *de novo* and the Circuit Court judgment was proper under the original pleading by civil warrant in the General Sessions Court. The Tennessee Supreme Court has formerly decided whether a plaintiff's recovery on a *de novo* appeal to a Circuit Court is limited by the General Sessions Court's jurisdictional amount. *Ware* v. *Meharry Medical College*, 898 S.W. 2d 181 (Tenn. 1995). In that case, Plaintiff filed a warrant in Davidson County General Sessions Court to recover personal property. *Ware*, 898 S.W. 2d at 182. The General Sessions Court dismissed Plaintiff's warrant, but on appeal, the Circuit Court awarded Plaintiff $75,000 in damages. *Id*. Defendant appealed to this Court. *Id*. A majority of this Court reduced Plaintiff's judgment to $25,000. *Ware*, 898 S.W. 2d at 181. On appeal, the Tennessee Supreme Court reversed our decision to reduce Plaintiff's judgment. The Court adopted the dissenting opinion of Judge William C. Koch, Jr., as its own rationale and held that a plaintiff's recovery in a Circuit Court was not limited by a General Sessions Court's jurisdictional limit. *Ware*, 898 S.W. 2d at 186. Accordingly, the trial judge in the instant case cannot be deemed biased or prejudiced based on the increased judgment.

None of LeMonte's claims support a conclusion, much less a reasonable suspicion, that the trial judge acted in a biased or prejudicial manner against LeMonte.

The judgment of the Trial Court is affirmed. This case is remanded to the Circuit Court of Montgomery County, Tennessee, for proceedings consistent with this opinion. Costs taxed on appeal to appellant, Ronald R. LeMonte, Jr.

RUSS HELDMAN, SPECIAL JUDGE