IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON

March 16, 2005 Session
**HUAN OUYANG  v. XIAOHUI CHEN**

**An Appeal from the Circuit Court for Shelby County
CT-003722-01   Kay S. Robilio, Judge**

**No. W2004-00335-COA-R3-CV - Filed August 26, 2005**

This is a divorce case.  The parties were declared divorced in February 2003.  The divorce decree reserved issues regarding their minor child, property valuation and distribution, alimony, and attorney's fees.  After a hearing on the reserved issues, the trial court granted the wife alimony and designated her the primary residential parent of their child, set child support, and distributed the marital property.  The husband appealed the trial court's decision on all of the reserved issues. We affirm the trial court's decision, with modification on the issue of the husband's residential parenting time.

**Tenn. R. App. P. 3 Appeal as of Right; the Judgment of the Circuit Court is Affirmed with Modifications and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S. and ALAN E. HIGHERS, J., joined.

Xiaohui Chen, pro se, defendant/appellant

Dennis J. Sossaman, Memphis, for plaintiff/appellee Huan Ouyang

**OPINION**

Defendant/appellant Xiaohui Chen ("Husband") and plaintiff/appellant Huan Ouyang ("Wife") were married on July 6, 1991 in the People's Republic of China. The marriage produced one child, Chelsey Ouyang Chen ("Chelsey"), born in the United States on October 19, 1999.

On June 18, 2001, Wife filed a complaint for divorce in the Circuit Court of Shelby County. As grounds for divorce, Wife cited irreconcilable differences and also alleged that Husband was guilty of inappropriate marital conduct.  In the complaint, Wife sought to be designated primary

residential parent, asserting that Chelsey has resided primarily with her and that Husband had not seen Chelsey since January 2001. Wife asked the court to grant her a divorce from Husband, divide their marital property pursuant to Tennessee law, award her alimony and child support, and enjoin Husband from removing Chelsey from Shelby County.

In response, on August 27, 2001, Husband filed an answer and a counter-complaint for divorce. In his response, Husband acknowledged that irreconcilable differences existed between the parties and accused Wife of inappropriate marital conduct. Husband accused Wife of adultery and alleged that he should be the designated primary residential parent. Husband asked the court to grant the divorce to him and award him child support.

By consent order dated September 26, 2001, Husband agreed to pay Wife $1,552.00 in temporary support for Chelsey. By consent order dated March 13, 2002, the parties agreed that Husband would have telephone visitation with Chelsey every night at 8:00 p.m. and that Husband would have visitation with Chelsey in person when he was in Memphis, provided he gave Wife 48 hours notice.

Preparation for the divorce trial continued. Husband filed a motion requesting that Wife undergo a psychological evaluation. The trial court granted Husband's motion, but ordered Husband to undergo a psychological evaluation as well. In advance of trial, both parties were evaluated and the evaluation indicated that neither would be a danger to their child.

In October 2002, Wife submitted a proposed parenting plan. This plan proposed that Wife be designated the primary residential parent; that Husband be required to attend parenting classes and anger management classes; and that Husband's residential parenting time be restricted because of his past neglect or non-performance of parenting functions, the absence of emotional ties between Husband and the child, and Husband's abusive use of conflict. Wife's proposed plan included a provision giving Mother sole decision-making authority.

In July 2003, Husband also submitted a proposed parenting plan. Husband's plan proposed that Wife be designated the primary residential parent until Chelsey is enrolled in kindergarten, and that he be designated primary residential parent thereafter. Husband requested that prior to Chelsey's enrollment in school, he be granted visitation with Chelsey for one week every month, for six weeks in the summer, and additional time whenever he is in Memphis and has given Wife two weeks prior notice. After Chelsey begins kindergarten, Husband requested that Chelsey reside with him and that Wife be granted visitation "whenever she is in town and for as long as she is in town, without disrupting the child's schooling and as long as [Wife] gives 2 weeks notice of visitation to [Husband]." Husband also proposed that he and Wife make decisions regarding Chelsey jointly, with Husband having the final decision-making authority.

By order dated February 21, 2003, the parties were declared divorced pursuant to Tennessee Code Annotated §36-4-129. The order reserved all issues regarding parenting time, child support,

property valuation and distribution, alimony, and attorney's fees. Both parties filed affidavits stating their income and the value of their property.

A hearing on the reserved issues was held on July 7, 2003. The trial was complicated by the fact that English is a second language for both Husband and Wife.

At the hearing, Wife testified that she and Husband had not lived together since 1995, when Husband moved to New Orleans to further his education. While Wife was pregnant, Husband asked for a divorce. Wife traveled to New Orleans to discuss the situation with Husband and found Husband's phone bills, which Wife alleged showed that Husband was having an affair. Wife testified that Husband did not want the baby and threatened to divorce her if she had the baby. After Wife gave birth, Husband came to Tennessee to visit her and the baby for two weeks.

Husband later moved to Houston, Texas, and filed for divorce in Texas. Wife testified that the Texas divorce action was dismissed. Subsequently, Husband moved to Phoenix, Arizona.

Wife testified that she was concerned about Chelsey being in Husband's care because Husband had spent little time with Chelsey and had no experience caring for her. She did not want Chelsey to have overnight visitation with Husband. Wife recounted that, in April 2000, Chelsey was injured as a result of being shaken by a baby sitter and the medical after-effects from that early injury were uncertain. Wife said that she wanted to be the primary decision-maker regarding Chelsey because she and Husband argued whenever they spoke to each other.

As to financial issues, Wife testified that the house that she lived in was worth approximately $154,504, based on the tax assessor's stated value. Wife also testified on the value of her automobile and the value of various other marital assets. Wife asked the court to award her three years of rehabilitative alimony so that she could attend nurse anesthetist school; she hoped completing nurse anesthetist training would enable her to double her salary. As background, Wife testified that she supported Husband while he was in school and also gave money to Husband's brother.

Husband testified as well. He told the court that he only married Wife so that she could come to the United States and that, initially, their relationship was platonic. The parties lived together for a time until Husband moved to New Orleans in 1995. By this time, Wife had met the requirements to get her nursing license.

At some point during 1995, Husband decided that he wanted their marriage to be a real marriage instead of a platonic relationship, and he told this to Wife. Toward the end of 1995, however, Husband began to suspect that Wife was having an affair with another man. Husband believed that the man with whom Wife was involved had stayed in her apartment.

Husband said that when Wife gave birth to Chelsey in October 1999, he came to visit them for about four weeks. After Chelsey was injured by the babysitter as an infant, Wife sent her to live with Wife's relatives in China, against Husband's wishes. Husband stated that he visited Chelsey

in China and spent two weeks with her there. In June 2001, Chelsey returned to the United States. Since her return, Husband testified, he had come to Memphis to visit her approximately every month or twice every three months. Between June 2001 and June 2003, Husband said, Wife allowed him to have overnight visitation with Chelsey only once. Husband asked the court to designate him as primary residential parent and asserted that he could do a better job of raising Chelsey than could Wife. Husband testified that in Phoenix, he has a four bedroom house with a pool.

Husband agreed with Wife's testimony that the parties fight, but alleged that Wife is responsible for the ongoing arguments. Father introduced photographs into evidence; two purported to show a toy that was broken during a fight between Husband and Wife and two others purported to show Husband's physical injuries after a fight with Wife.

As to financial matters, Husband alleged that from June 1997 through May 2001, he had given Wife a total of $59,152. Husband noted that, in her deposition, Wife denied ever receiving this money.

On July 30, 2003, the trial judge sent a letter to counsel for the parties outlining her conclusions from the trial. In general, the trial judge found Wife's testimony to be credible and found that Husband's testimony was not credible. The letter to counsel references proposed Finding of Facts and Conclusion of Law submitted by both parties (which are not included in the record), and indicates that the trial court would adopt Wife's parenting plan and the majority of her proposed findings of fact and conclusions of law. The pertinent portion of the letter states:

> 1) The Court has no problem with [Husband] having his daughter, Chelsey Ouyang Chen, during the summer months apart from [Wife's] Parenting Plan if [Husband] is on vacation. If he is not working and can fully devote time and attention to his daughter, then the Court believed that he should be given that opportunity.
> 2) Under ordinary circumstances, the Court does not grant attorneys' fees, but prefers that each party pay his or her own attorneys' fees. In this case, the Court finds that [Husband's] petition to the Court for custody of his daughter was not based on anything other than a personal predilection; i.e., he has never been the primary caregiver for his daughter. The bond that has been established between [Wife] and daughter because of [Husband's] not being active in his daughter's life over significant periods of time causes the daughter to experience some discomfort by being away from her mother. As Chelsey grows older, becomes more confident and secure and able to take care of herself, undoubtedly she won't feel this insecurity. For the time being, [Husband's] petition to be the primary caregiver simply had no basis and, because of this controversy, significant attorneys' fees were pyramided.
> * * *
> 5) The Court found [Wife's] testimony generally credible, but found that the [Husband's] testimony was intermittently obfuscating, evasive, and illogical; e.g., [Husband's] testimony regarding his wish to divorce his wife, yet impregnating her thereafter.

6) In this situation, the Plaintiff is requesting rehabilitative alimony pursuant to T.C.A. § 36-5-10(d)(1) for three years which would allow her to attend school and would allow her future income to be increased, though certainly not to the degree of Defendant's income. Thus, the Court believes that rehabilitative alimony is justified in this case. In making this determination, the Court has considered the following relevant factors from T.C.A. § 36-5-101(d)(1)(E):

> (1) the relative earning capacity of Defendant and Plaintiff and the obligations, needs, and financial resources of both parties: the Defendant has been shown to make almost three times as much money per month as Plaintiff.
>
> (2) the relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity. Here, the Defendant is a physician and the Plaintiff is a registered nurse. Plaintiff is willing and able to further her education to increase her future earning capacity and has a plan in place to attend CRNA school.
>
> (3) The duration of the marriage: here, the parties were married from 1991 to 2003.
>
> (4) The age and mental capacity of the parties: the Plaintiff is able to continue her education with no limitations as to her age or mental capacity.
>
> (5) There are no apparent limitations to Plaintiff as to her physical condition.
>
> (6) Plaintiff has successfully worked outside of the home and has continued to be an exemplary parent. Her concern about the Defendant's parenting has been justified. By Defendant's own testimony, his daughter's comfort level suffered at times because Chelsey felt insecure being away from her mother.
>
> * * *
>
> (9) The Plaintiff's standard of living will be significantly reduced post-marriage.
>
> (10) The Court believed Plaintiff has made significant contributions to the education of Defendant and his brother. She has also significantly contributed to the marriage as the primary caregiver to Chelsey since the child's birth in 1999.
>
> (11) As to fault, Defendant's refusal to make the appropriate commitment to the marriage at the significant, if not crucial, times secured the demise of the marriage.
>
> * * *

(11) As to fault, [Husband's] refusal to make the appropriate commitment to the marriage at the significant, if not crucial, times secured the demise of the marriage.

-5-

The letter also stated that rehabilitative alimony was justified in this case based on the trial court's analysis of the factors stated in Tennessee Code Annotated § 36-5-101(d)(1). The letter went on to note that if the case were appealed and the appellate court found that rehabilitative alimony was inappropriate, then transitional alimony would be appropriate based on the relative earning capacity of the parties.

On December 12, 2003, the trial court entered an order ("Final Order") setting forth the trial court's findings, adopting Wife's proposed parenting plan, and incorporating the trial judge's July 2003 letter to counsel. The Final Order also divided the parties' marital assets, with each party receiving assets valued at approximately $122,938. Additionally, Husband was ordered to pay Wife rehabilitative alimony of $1,000 per month for three years, alimony *in solido* of $10,908 to defray her legal expenses, and alimony *in solido* of $1,250 to defray Wife's expenses for the psychological evaluation.

The parenting plan, adopted by the trial court in the Final Order, designated Wife as the primary residential parent and ordered Husband to pay child support of $2,600 per month, based on Husband's salary of $18,000 per month. The parenting plan granted Husband visitation with Chelsey; prior to Chelsey enrolling in school, however, the visitation was permitted only in Memphis, with 15 days' notice to Wife, provided Husband "is not working, on vacation, and can devote time and attention to his daughter. . . ." After Chelsey is enrolled in kindergarten, Husband was again granted parenting time in Memphis, but in addition, on school holidays, was granted parenting time in the city in which he resides. The provision on Husband's visitation during the summer (after Chelsey is enrolled in kindergarten) provides that Husband is permitted visitation in the city in which he resides, but once again with the restriction that Husband must be "not working, on vacation and can devote time and attention to his daughter."

The parenting plan noted that Husband's residential parenting time with Chelsey was restricted because of his "neglect or substantial non-performance of parenting functions; absence of or substantial impairment of emotional ties between the child and the parent; [and] abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development." The parenting plan orders Wife to consult with Husband on major decisions regarding Chelsey but states that Wife would have final decision-making authority. Finally, the parenting plan ordered Husband and Wife to each pay half of Chelsey's private school tuition and fees.

In December 2003, Husband filed a motion to alter or amend the parenting plan. Husband asserted that his income was $12,708 per month rather than the $18,000 per month as found in the parenting plan. Husband also requested a downward deviation from the standard child support guidelines to help offset his travel costs incurred in visiting Chelsey. Further, Husband asserted that he should not be required to pay half of private school tuition since Wife will be the primary decision-maker.

By order dated January 9, 2004, the trial court reduced Husband's child support obligation from $2,600 per month to $1,856 per month, which, based on Husband's corrected monthly income, was consistent with Tennessee Child Support Guidelines. The trial court denied Husband's request for a downward deviation of child support and did not modify its prior order that Husband pay half of Chelsey's tuition.

Husband appealed the final rulings on February 5, 2004. On appeal, Husband, acting *pro se*, submitted a 98 page brief to this Court for review. In general, Husband asserts numerous errors by the trial court such as the amount of child support, the grant of alimony, the award of attorney's fees, and the valuation of marital property. Throughout his brief, Husband asserts that the trial court's rulings were based on "bias, disability, irresponsibility, and dishonesty." Husband does not clearly articulate issues on appeal, other than dissatisfaction with the result. However, we will endeavor to restate his issues as we perceive them.

Husband asserts repeatedly that the trial court's decision resulted from the trial judge's alleged bias, irresponsibility, dishonesty and disability. However, at no point prior to the trial or during the trial did Husband move that the trial judge recuse herself. A litigant may not wait until he sees the outcome of the case and then, having received a decision adverse to him, assert that the trial judge should have recused himself. *Jerrolds v. Kelley*, 2004 WL 948743, *4 (Tenn. Ct. App. 2004). It is not enough for a litigant to make conclusory allegations of bias or improper behavior by the trial judge; he must be able to point to specific facts to support any allegation of impropriety. *Mayes v. LeMonte*, 122 S.W.3d 142, 146 (Tenn. Ct. App. 2003). Other than his astonishment at how the trial judge could possibly disbelieve his testimony or his arguments, Husband points to no facts to support his sweeping allegations. Moreover, we have reviewed the record in this cause and find only indications that the trial judge patiently listened to the parties' testimony, interjected periodic inquiries to clarify their assertions, and endeavored to reach a reasonable resolution of the issues. Consequently, we find Husband's assertions of impropriety on the part of the trial court to be wholly without merit, and we go on to consider the substantive issues raised on appeal.

In this case, the parties' testimony differed in many important respects, and resolution of the issues turns on a determination of the parties' credibility. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge who has the opportunity to observe the witnesses in their manner and demeanor while testifying is in a far better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *Id.*; *In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997). In this case, the trial court found that, overall, Wife's testimony was credible and Husband's testimony was not. From our review of the record, we find that this determination of the parties' credibility was supported by the evidence, and we therefore accord it full deference.

On the issues regarding the award of alimony, guidelines for the determination of alimony are set forth in Tennessee Code Annotated § 36-5-101 (d) (Supp. 1997). The trial court is afforded

wide discretion concerning the award of alimony, and an appellate court should reverse the trial court's findings only in instances in which this discretion "has manifestly been abused." *Hanover v. Hanover*, 775 S.W.2d 612, 617 (Tenn. App. 1989); *Ford v. Ford*, 952 S.W.2d 824, 827 (Tenn. App. 1997).

Husband questions the trial court's decision on his request to modify his child support obligation. Our review of the trial court's decision with regard to the child support modification is *de novo* upon the record, with a presumption of correctness of all of the trial court's findings of fact, unless the evidence preponderates against the findings. Tenn. R. App. P. 13(d); *Leach v. Leach*, No. W2000-00935-COA-R3-CV, 2001 Tenn. App. LEXIS 467, at (Tenn. Ct. App. June 25, 2001).

Husband disagrees strongly with the trial court's decision designating Wife as the primary residential parent and setting a schedule for his visitation. In child custody and visitation cases, the welfare and best interest of the child are the paramount concerns. *See Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997); Tenn. Code Ann. § 36-6-106 (1996). The determination of the child's best interest must turn on the particular facts of each case. *See Taylor v. Taylor*, 849 S.W.2d 319, 326 (Tenn. 1993); *In re Parsons*, 914 S.W.2d 889, 893 (Tenn.App. 1995). In *Bah v. Bah*, 668 S.W.2d 663 (Tenn. Ct. App.1983), the Court described the guidelines for making the determination of the child's best interest:

> We adopt what we believe is a common sense approach to custody, one which we will call the doctrine of "comparative fitness." The paramount concern in child custody cases is the welfare and best interest of the child. *Mollish v. Mollish*, 494 S.W.2d 145, 151 (Tenn. App.1972). There are literally thousands of things that must be taken into consideration in the lives of young children, *Smith v. Smith*, 188 Tenn. 430, 437, 220 S.W.2d 627, 630 (1949), and these factors must be reviewed on a comparative approach:
>
> Fitness for custodial responsibilities is largely a comparative matter. No human being is deemed perfect, hence no human can be deemed a perfectly fit custodian. Necessarily, therefore, the courts must determine which of two or more available custodians is more or less fit than others.

Edwards v. Edwards, 501 S.W.2d 283, 290-91 (Tenn. App.1973) (emphasis supplied). *Bah*, 668 S.W.2d at 666. The trial court must also consider the factors set forth in Tennessee Code Annotated § 36-6-106. These factors include:

> (1) The love, affection and emotional ties existing between the parents and child;
> (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;
> (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding,

under § 36-6-106(8), of child abuse, as defined in § 37-15-401 or §39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents;

(6) The home, school and community record of the child;

(7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child.

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child. . . .

T.C.A. § 36-6-106 (Supp. 1998). The presumption of correctness applicable to a trial court's findings of fact pursuant to Rule 13(d) of the Tennessee Rules of Appellate Procedure applies in child custody cases. *Hass v. Knighton*, 676 S.W.2d 554, 555 (Tenn. 1984); *Whitaker*, 957 S.W.2d at 838.

Husband also raises issues regarding the trial court's division of marital property. Although there is a presumption that marital property is owned equally, there is no presumption that marital property should be divided equally. *See Bookout v. Bookout*, 954 S.W.2d 730, 731 (Tenn. App. 1997). Thus, an equitable division of the marital property need not be an equal division of the property. *See id.* A trial court is afforded wide discretion when dividing the marital property, and its distribution will be given "great weight" on appeal. *See Ford v. Ford*, 952 S.W.2d 824, 825 (Tenn. App. 1997). Guidelines for the equitable division of marital property are set forth in Tenn. Code Ann. § 36-4-121 (c) (2001).

On appeal, Husband argues that the trial court, in its Final Order, calculated child support based on an amount "fabricated by [Wife's] attorney" and that, therefore, the attorney committed

a fraud upon the court. Later in his brief, however, Husband acknowledges that this "fraud" or error was caught and corrected during the trial. In addition, the trial court altered the provisions in the Final Order that set child support based on an erroneous monthly income amount. The trial court then used the corrected monthly income figure supplied by Husband as the basis for the modified child support obligation. Accordingly, we find no error regarding the trial court's calculation of Husband's child support obligation.

Husband also asserts that his employment has changed since March 2004, after the Final Order and the appeal was filed, and asks that child support be assessed on his new income. This not a proper issue for appeal, and Husband's asserted change in his employment should be addressed to the trial court.

Husband takes issue with numerous rulings contained in the parenting plan. For example, Husband asks for equal parenting time and joint decision-making authority regarding Chelsey. Husband also objects to the language in the parenting plan that states that the "parties agree as follows regarding private school . . . and college," apparently asserting that he never agreed to pay for private school tuition. Husband argues generally that all of these decisions were based on false statements and bias. Based on our review of the record, and with deference to the trial court's determinations of credibility, we conclude that the evidence does not preponderate against the trial court's decisions on the allocation of parenting responsibilities. Accordingly, we affirm on these issues.

Husband argues that the trial court erred in limiting his parenting time and in requiring him to be on vacation during the summer months in order to see Chelsey. Husband notes that the trial court restricted his parenting time because of "neglect or substantial non-performance of parenting functions; absence of or substantial impairment of emotional ties between the child and the parent; [and] abusive use of conflict by the parent which creates the danger of serious damage to the child's psychological development." Husband asserts that these rulings were based on the false testimony by Wife and that the trial judge accepted this testimony based on bias against Husband. As noted above, we see no bias or impropriety in the trial court's ruling. Moreover, the decision is based on the trial court's credibility determination, which is given great weight on appeal. *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. App. 1997) Even so, the evidence in the record is not sufficient to support the requirement that, once Chelsey is enrolled in kindergarten, Husband must be "not working [and] on vacation" in order to have residential parenting time with her in the city in which he resides. If that restriction were upheld, Husband's residential parenting time with Chelsey would be so limited as to prevent him from forming a relationship with her. Provided appropriate child care arrangements are made, the evidence does not support a restriction that would prevent Chelsey from visiting Husband in the city in which he resides if he was required to work during a portion of the visitation period. Accordingly, as to Husband's summer visitation with Chelsey after she is enrolled in kindergarten, we modify the award of visitation to remove the requirement that Husband be "not working [and] on vacation" during the entire period of visitation with Chelsey. We note that the trial court did not set an amount of visitation during the summer break or school holidays, presumably because the requirement that Husband be on vacation limited

the length of the visitation.  We remand this issue to the trial court for a determination of the proper amount of time for visitation during summer, as well as any other appropriate related provisions, including but limited to the child care provided if Husband cannot be with Chelsey during a portion of the visitation period.

On appeal, Husband asks this Court for a "fair" property valuation   At trial, Wife entered into evidence a document from the Shelby County Tax Assessor that valued the marital residence at $154,504.  The trial court used this valuation in dividing the marital assets.  Husband asserts that the property is worth more than the assessed value. However, he points to no other evidence in the record regarding the value of the marital residence.  This argument is without merit.

Husband also appears to argue that the trial court erred in dividing the marital property.  A trial court is granted the authority to divide marital property under section 36-4-121 of the Tennessee Code Annotate. T.C.A. § 36-4-121 (2000).  As noted above, the trial court's division of marital property will be given great weight on appeal.  After reviewing the record, we find no error in the trial court's division of marital property and therefore affirm on this issue.

Husband asserts that the divorce was Wife's fault for allegedly having an extra-marital affair. Based on this assertion, he argues, Wife should not have been awarded alimony, attorney's fees, and psychological evaluation fees.  Pursuant to Tennessee Code Annotated § 35-5-101(d)(1)(K), a trial court may consider the relative fault of the parties in determining the nature and amount of alimony.[1] T.C.A. § 35-5-101(d)(1)(K) (2001). The trial court, in its letter to counsel, found that Husband's refusal to make the appropriate commitment to the marriage "secured the demise of the marriage." With appropriate deference to the trial court's determination of credibility, this finding was fully supported by the evidence at trial, and any fault on Wife's part would be outweighed by Husband's greater fault.  Accordingly, we affirm the trial court's decision on these issues.

We also construe Husband's brief to include an argument that the trial court erred in granting any award of alimony to Wife.  In its letter to counsel, the trial court articulated eleven factors that it considered in granting rehabilitative alimony.  The trial court also stated that  it granted alimony *in solido* to cover the cost of attorney's fee because Husband's petition for custody had no basis and increased the cost of the litigation.  An appellate court should reverse a trial court's findings on alimony only in instances in which this discretion "has manifestly been abused."  ***Hanover v. Hanover***, 775 S.W.2d 612, 617 (Tenn. App. 1989); ***Ford v. Ford***, 952 S.W.2d 824, 827 (Tenn. App. 1997).  We find no error in the trial court's analysis on either rehabilitative alimony or alimony *in solido*.  Accordingly, we affirm.

---

[1] Under T.C.A. § 35-5-101(d)(1)(K) a trial court may also consider "[t]he relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so."  T.C.A. § 35-5-101(d)(1)(K) (2001).

-11-

The decision of the trial court is affirmed, with modification to Husband's residential parenting time as set forth above, and the cause is remanded for further proceedings not inconsistent with this Opinion.  Costs are assessed one-half to Appellant Xiaohui Chen and one-half to Appellee Huan Ouyang, for which execution may issue if necessary.


                                              _____

_____HOLLY M. KIRBY, JUDGE