IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
September 21, 2006 Session

## LISA ANN (GALLAHAIRE) CARTWRIGHT
### v.
## ROBERT HOWARD CARTWRIGHT, SR.

**An Appeal from the Chancery Court for Benton County**
**No. 981     Ron E. Harmon, Chancellor**

---

**No. W2005-02759-COA-R3-CV - Filed January 31, 2007**

---

This is a divorce case involving the classification and division of marital property. The parties signed a prenuptial agreement. After they married, the parties operated a cattle and farming business, which was conducted in the wife's name only. After three years of marriage, the wife filed a petition for divorce. A trial was held primarily on issues related to property distribution. The husband argued that the cattle and farming equipment was purchased with his separate funds and therefore was his separate property under the prenuptial agreement. The husband also alleged that the wife had discarded or destroyed numerous items of his separate property. The trial court found that the cattle and farming equipment was marital property and divided it equally, and declined to find the wife responsible for the items that had been discarded or destroyed. The husband now appeals. We affirm, concluding that the evidence does not preponderate against the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and ALAN E. HIGHERS, J., joined.

Laura A. Keeton, Huntingdon, Tennessee, for the Appellant/Defendant, Robert Howard Cartwright, Sr.

W. Brown Hawley, Paris, Tennessee, for the Appellee/Plaintiff, Lisa Ann (Gallahaire) Cartwright.

### OPINION

Plaintiff/Appellee Lisa Ann (Gallahaire) Cartwright ("Wife") and Robert Howard Cartwright, Sr. ("Husband"), were married on January 1, 2001. A few days prior to the marriage, on December 29, 2000, the parties executed an "Antenuptial Agreement" ("Agreement") setting out their respective rights upon the termination of the marriage. The parties do not dispute the validity of the Agreement.

At the outset, the Agreement noted that Husband had a large estate going into the marriage, worth about $1 million, and Wife had a modest estate, worth about $50,000. Generally, the Agreement provided that all property owned by the parties separately before the marriage would remain separate property in the event of a divorce, and property acquired during the marriage and titled in both parties' names would be considered marital property subject to an equal distribution.

When the parties married, Husband was not employed. His monthly income consisted of social security disability benefits, rental income from three businesses, including a sports bar, as well as gaming machine proceeds. Wife was employed prior to the marriage and continued her employment after the parties married. At some point, Husband discovered that he had cancer. The required treatments for his condition left him somewhat dependent on Wife for his daily needs. In January 2002, Husband asked Wife to quit her job to take care of him. Wife did so and did not return to work when Husband's health later improved.

Soon after they married, the parties purchased two tracts of land in Benton County, Tennessee. On the first tract of land, about 233 acres, the parties built the residence in which they lived during the marriage. On the other tract of land, about 167 acres, the parties began a farming and cattle operation. During the marriage, they purchased farm equipment and cattle in furtherance of the business.

Husband had several joint bank accounts during the marriage. Three of the joint accounts were with Wife. One of the three accounts with Wife was used for household expenses, the second was a "farm" account out of which the parties conducted the farming operations, and the third was used to operate Husband's rental property. Husband also had a joint bank account with his mother, who died in July 2003.[1] Some payments for farming equipment, cattle, and feed were made from Husband's joint account with his mother, and some were made from his joint account with Wife.

On June 3, 2004, Wife filed a petition for divorce in the trial court below. Pursuant to Wife's request, the trial court ejected Husband from the marital residence, and Wife lived there alone for several weeks. Thereafter, Husband filed an answer to Wife's petition, a counter-complaint for divorce, and a motion to obtain access to the marital residence. On August 3, 2004, the trial court entered an order granting Husband's motion, ordering Wife to vacate the marital residence, and requiring Husband to pay Wife $1,000 per month in temporary spousal support.

After Wife left the marital residence, pursuant to the trial court's order, Husband returned to it. When Husband arrived, he discovered that the house was almost empty, and that most of his possessions had either been removed or damaged. Among the items allegedly missing were furniture, keepsakes, inherited jewelry, hunting trophies, linens, cookware, food, and clothes. In addition, Husband's boat and video machines had been vandalized, and sugar had been put in the gas tank of his John Deere lawn tractor.

---

[1]Husband's father was also on this account. Husband's father died in March 2003. The record does not indicate any involvement by Husband's father in the farming operation.

On February 10 and March 23, 2005, the trial court held a hearing on the parties' petitions. At the outset of the hearing, the parties stipulated as to grounds for divorce. Therefore, the only issues that remained for determination at trial related to property division. The parties further agreed that the property division issues were controlled by their antenuptial agreement.

Wife testified at the hearing about her property ownership. She acknowledged that, when she and Husband married, she brought to the marriage only her car and a premarital home. After she married Husband, she sold her premarital home and contributed $10,000 of the proceeds to their marriage.

After the parties married, Wife continued working. In January 2002, Wife was working as an assistant manager for a check-cashing business. She said that, after Husband became ill with cancer, she missed several days of work because Husband required much physical assistance. She helped him bathe and dress and accompanied him to all of his chemotherapy treatments. Finally Husband asked her to quit work to take care of him. She did so and had not returned to work since then. Wife testified that Husband had been cancer-free since February 2002. At the time of trial, Wife had no source of income other than Husband's temporary spousal support payments of $1,000 per month. After having paid a total of approximately $7,000, Husband stopped making these payments in December 2004. Wife indicated that she was unable to find suitable employment because she had been "in and out" of the hospital due to a potassium deficiency.

When the parties married, Husband was unemployed; he had retired from operating Bob's Sports Bar and Grill and had begun collecting disability benefits. She testified that Husband's income consisted of disability benefits, rental income, and gaming machine income. Wife said that, at times, she and Husband co-mingled their monies with those of his parents.

Wife testified that her name was on the deed of both parcels of land purchased by the parties, and that she and Husband had equal interests in the real property. The farming business, however, was operated in her name only. Purchases made for the farming business were billed to her, and all of the money earned was paid in her name only. She and Husband bought and sold cattle, always in her name only. Wife added that Husband was "very careful" not to put anything in his own name.

Wife testified about the three bank accounts she had held jointly with Husband. She stated that the farm account was under her social security number, and that all of the farm bills were paid out of this account. Wife testified that, a couple of months before telling her he wanted a divorce, Husband took the funds from their joint farm account and their joint business account and cancelled those accounts.

Wife testified that, during their marriage, the parties purchased numerous items of value from their joint funds. This included farm equipment and tools, such as dump trucks, tractors, four wheelers and the like, as well as furniture for the marital home.

Wife claimed that, during the marriage, the parties jointly paid off some of Husband's debts incurred prior to the marriage. She said that she helped him pay a $6,600 debt for security systems that he had purchased, as well as a loan for the building he rented out to other businesses. Wife testified that she also helped Husband obtain a loan to pay for paving on the Bartlett property, which, at the time of trial, had a loan balance of $6,629. Wife said that she and Husband together paid off the debt on the farm they purchased during the marriage.

Wife submitted the parties' joint federal tax returns for 2002 and 2003 as evidence that the farming equipment was owned by both parties. On those returns, the parties listed and depreciated their farming equipment and indicated that it was used for business purposes.[2]

Wife testified that, when she moved out of the marital home, she removed only items that had belonged to her before the marriage. She said that she took none of the home furnishings purchased by the parties during the marriage, except for the master bedroom furniture purchased jointly before the marriage. Wife denied putting any of Husband's personal property, such as pictures and other items that had belonged to his parents, in a gully behind the barn. She said that she "loved his parents dearly" and explained that some things were discarded when she and Husband cleaned out the barn. Wife claimed that, after she moved out, she called someone from the sheriff's department to go through the house to note its condition, but no one was available. She submitted as evidence photographs taken of the home when she moved out, to show the condition of the home and its contents at that time. Wife denied Husband's accusations that she had damaged the home, the tractor, the boat, or the video machines before she left.

Wife acknowledged that Husband had sold some cattle to pay some of his debts to her but suspected that he had sold more cattle than was necessary because "[a] lot more [cattle] are missing" than he admitted to selling. She indicated that, "probably a dozen" times, Husband had been seen leaving the farm with cattle and returning with an empty trailer. Wife testified that Husband held an auction at which he sold numerous items, including personal property purchased during the marriage. She claimed that some of the items sold at the auction were things that he had earlier claimed were missing from the house after she vacated it. Wife was not given any of the proceeds from the auction.

Wife said that she was seeing a counselor for psychological difficulties that arose from her separation from Husband because, she said, her life had revolved around Husband and she did not want to divorce him. At the time of trial, Wife was taking medication for her emotional condition.

Husband also testified at the hearing. At the time of trial, he was fifty years old. Husband asserted that, during the time in which Wife occupied the marital home by herself, she took several items that belonged to him and either discarded them or kept them for herself. When Husband returned to the home after Wife vacated it, he took a police officer with him. He said that, when he

_____

[2]The equipment listed on the tax returns include: tractor, two disks, bush hog, breaking plow, middlebuster, hay fork, blade, fences, barn roof, culverts, and a 4-wheeler. All of this property was purchased after the marriage.

-4-

entered, there was nothing in the house. He later went to the barn, accompanied by a friend, and there they discovered the damage to the John Deere tractor, the boat, and the video machines. Husband reported the damage to the police, but did not file a claim on their insurance policy because damage inflicted by his wife would not have been covered. Husband submitted into evidence a list of items he claimed that Wife had taken or damaged, including heirlooms, photographs, tools, silver, and other items.[3] Husband listed $80,000 in jewelry and furs that he had inherited from his parents and other relatives, a $30,000 eight-drawer chest that contained genuine silver, a $25,000 china cabinet with genuine china and silver, and a $7,000 above-ground swimming pool. Husband assigned a total value to these items of $177,359. In addition, he asserted that the master bedroom suite Wife took with her when she moved was his separate property, purchased with his separate money.

Husband claimed that he paid the house note, farm expenses, and real estate taxes out of his separate money. He acknowledged that he had asked Wife to quit work to care for him during his struggle with cancer, but said that it was her decision not to return to work after he recovered.

Husband testified that the original cattle purchased for the farm were bought by his mother, and that the number of cattle and calves in the herd had stayed approximately the same size from the time they were bought. He later admitted, however, that about as many cattle were purchased in Wife's name as in his mother's name. Husband claimed that the parties chose to sell cattle and crops in Wife's name so that Wife could show a source of income in order to obtain a financial grant for her daughter's college education. He noted that the cattle purchased in Wife's name were sold before the trial. Husband claimed that the cattle operation was merely his hobby, and he did not make a profit. He asserted that the proceeds from any sales were simply used to pay for feed.

Husband testified about the checking account he held jointly with his mother. He asserted that cattle, cattle feed, and farm equipment were purchased out of this account. Husband submitted bank statements in support of his testimony.

Husband testified that, at the time of trial, his monthly income consisted of social security disability payments ($1,170), bar lease income ($2,100), and rental income from two other businesses ($3,600). He denied Wife's assertion that he received money from games in the sports bar he previously owned, and claimed that the gaming machines had been removed. Husband admitted that some of the proceeds from the farm operation went into the joint account with his mother. He stated, "I did put some money in there to pay her back on some of the stuff that we had bought when the crops [came] in . . . ." He said that the remaining proceeds from the farming operation went into his joint farm account with Wife.

In rebuttal, Wife denied taking the items listed by Husband, other than the bedroom suite and items that were her separate property. She specifically denied taking certain items, such as furniture

---

[3]It is undisputed that, when Mrs. Cartwright died, her estate passed to Husband and his brother, Thomas Cartwright.

and silver that had belonged to Husband's mother, and pointed out that her photographs showing the condition of the house when she left included photographs of furniture and silver. Wife noted that the auction sheet listing items sold by Husband included antique china and silver. Wife admitted that she took the above-ground swimming pool, but claimed that "[h]e [Husband] told me to get it out." Wife claimed that Husband took a pressure washer and patio furniture that belonged to her.

Both parties testified about a Hartford Investment Account, purchased in March 2004 in Husband's name only, with an initial investment of $55,000. A cashier's check was used to open the account, and the cashier's check did not indicate the source of the funds. At one point, Husband claimed that the initial investment was from the estate of his mother, who died in July 2003. He later claimed that the initial investment came from the sale of his premarital home. Wife argued that this account was funded partly from monies taken by Husband when he cleared out two of the parties' joint bank accounts.

A friend of both parties, Tony Stevens ("Stevens"), testified at trial. When Wife moved out of the marital home, she rented living space from Stevens, who had farmed the land with Wife and Husband. Stevens helped Wife move out of the marital residence and said that, when they left, no property had been damaged. Stevens stated that Wife, her father, and he checked the residence before Husband returned to the house, and everything was in order and furniture was in the house. Stevens said that Wife had stored some of her things in Stevens' house; some of these things had been taken to a storage unit.

Two neighbors of the parties also testified at the hearing. One neighbor testified that he saw pots, pans, silverware, clothes, and other items belonging to Husband in the dump behind their barn. The other neighbor testified that, in July 2004, he was running on the road near Stevens' home and found some of Husband's personal belongings strewn along the side of the road, such as file folders with photographs and documents, a framed picture, three boots and one loafer with no matching shoe, deer antlers, a bag of shotgun shells, and a denim bag. A Benton County Deputy Sheriff testified that he went with Husband at Husband's request to the marital home on approximately July 22, 2004, and that he and Husband found that "[e]verything was gone except the refrigerator, and I think the stove was there, the TV, a couch and a chair."

An appraiser who was retained to value the parties' real property for trial determined that the property on which the marital home was situated was worth $340,000. The farm land appraised for $197,000. By the time of trial, the parties had paid off the farm property, but still owed $238,000 on the marital residence.

At the conclusion of the evidence, the trial court issued an oral ruling. The trial court held that the parties' real estate, jointly owned, was marital property and should be divided equally. It further determined that the cattle and farm equipment listed on the parties' joint tax returns were marital property, also to be divided equally. The trial court permitted Husband to retain the $55,000 investment account as his separate property, finding that it was established with proceeds from his mother's estate.

The trial court also made findings regarding Husband's claim that some of his separate property was taken or damaged by Wife. The trial court found that, when Husband returned to the home after Wife had left, some property was missing and other property had been vandalized. However, the trial court specifically declined to assign responsibility for these actions. The trial court stated:

> The Court finds the house was substantially empty when the husband returned to the house, that the garage was substantially empty of belongings when he returned, that in addition to the [John Deere tractor] being vandalized, the boat and motor vandalized, there was also vandalism to the video machines. The Court makes no findings as to the person responsible for those items. They are awarded to the husband in their damaged condition. The Court finds they have little or no value.

The trial court commented that Husband would be "entitled to the damages to his boat, as soon as we decide who has perpetrated it." The trial court stated that its division of property took into consideration "the actions of the parties, in particular [Wife]." The trial judge remarked that "the actions of the parties, in particular [Wife], has weighed greatly on the Court's mind in this division because . . . it's obvious to the Court that there have been some things done here that should not have been with regard to each other's property, with regard in particular to [Husband's] property." The trial court then directed the parties to immediately return any property belonging to the other, particularly property "of a personal nature or a sentimental nature."

Finally, the trial court determined that Wife was not entitled to alimony, in accordance with the parties' Agreement, and it credited Husband's share of the marital property with the $7,000 already paid to Wife in temporary spousal support. Each party was held responsible for his or her own attorney's fees. On July 21, 2005, the trial court entered an order incorporating its oral ruling. The trial court later entered an order resolving miscellaneous issues. From this final order, Husband now appeals.

On appeal, Husband argues that the trial court erred in classifying the farm equipment and cattle as marital property. He claims that the evidence shows that these items were purchased solely with funds from the bank account owned by him jointly with his mother, and that Wife had no interest in the account at the time the purchases were made. Under the prenuptial agreement, he claims, Wife can have no interest in items purchased by him with separate funds. Husband also argues that, in making its equitable distribution of the marital property, the trial court erred in failing to award him some compensation for his separate property that was disposed of or damaged by Wife when she had sole possession of the house. He claims that the list he submitted showed that Wife was responsible for the approximately $177,000 in separate property belonging to him that was missing from the home when she left. Husband notes that the marriage was of a short duration, and that, "[e]ven with the offset of the missing property, Wife still leaves the marriage with much more than she brought to it."

The classification of property as either separate or marital property is a question of fact. ***See Brown v. Brown***, 913 S.W .2d 163, 167 (Tenn. Ct. App. 1994). Therefore, the trial court's findings with respect to property classification are reviewed *de novo*, presuming those findings to be correct unless the preponderance of the evidence is otherwise. ***See Brooks v. Brooks***, 992 S.W.2d 403, 404 (Tenn. 1999); Tenn. R. App. P. 13(d). Questions of law are reviewed *de novo*, with no presumption of correctness. ***Nelson v. Wal-Mart Stores, Inc.***, 8 S.W.3d 625, 628 (Tenn. 1999). A trial court is afforded wide discretion in dividing marital property, and its distribution will be given "great weight" on appeal. ***Ford v. Ford***, 952 S.W.2d 824, 825-26 (Tenn. Ct. App. 1996). The trial court's division of marital property will not be disturbed on appeal unless it lacks evidentiary support or results from an error of law or a misapplication of the statutory requirements. ***Thompson v. Thompson***, 797 S.W.2d 599, 604 (Tenn. Ct. App. 1990).

We first address Husband's argument that the trial court erred in classifying the farming equipment and the cattle as marital property. The trial court must first classify the parties' property as either "separate" or "marital" before it can order an equitable distribution of the property. ***See Batson v. Batson***, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). In this case, the trial court did not elaborate on the reasoning for its decision to classify the cattle and farming equipment as marital property. The trial court stated:

> [I]tems that are held jointly by these parties we'll consider joint property and will be marital property and will be divided as marital property.
> There was some dispute about some of the personalty that was purchased by the husband but was filed and depreciated on the joint tax returns of the parties. . . . [T]hat will be considered marital property also and will be treated as marital property.

As to the cattle, the trial court simply stated, "[T]he cattle the Court finds to be marital assets and will be divided equally between the parties."

On appeal, Husband acknowledges that the cattle and farm equipment were purchased during the marriage. He claims, however, that this property was purchased with his own separate funds, and that, therefore, it remains his separate property under the terms of the parties' prenuptial agreement. In response, Wife disputes that the bank account owned by Husband jointly with his mother constituted separate property. She notes that some farming operation income was put in that account, and that the account was used for other farming operations as well. Wife notes that she was eventually added as a signatory on that account. She emphasizes the undisputed fact that some of the cattle was purchased in her name, and that the farming and cattle business, for which the equipment was used, was generally operated in her name. All of this is in addition to the fact that the equipment was listed as joint property on the parties' joint tax returns.

Husband does not identify the particular provision in the prenuptial agreement on which he relies for his argument that property purchased with separate funds was to remain separate property throughout the marriage. The prenuptial agreement contains the following pertinent language:

Both parties shall retain the title and all rights to manage, control, and the possession of, and to the estate and income which they now own, or which they may acquire by any means including, but not limited to, gift, inheritance, or purchase, whether it be realty, personally [sic], or mixed . . . as though such party had remained single and unmarried, entirely free and unmolested by the other party. . . .

Should the marriage between the parties be terminated by . . . divorce, . . . each party waives all claims against the other party or the estate, increase in the estate or income, inheritance or gifts of the other including, but not limited to, a claim for property distribution, alimony, support, . . . or any right by . . . marital property portion, equitable distribution or otherwise. Any new assets that are acquired during the marriage and that are titled in both parties' names will be divided equally (50/50) between the parties in the event of a divorce.

This language indicates that the parties agreed to retain their separate property owned before the marriage. They also agreed that any new assets acquired during the marriage and titled in both parties' names would be considered marital property and divided equally upon a divorce. The agreement is less clear about property acquired during the marriage not titled in both parties' names. It simply says that each party would "retain the title" to property acquired during the marriage "by any means," "as though such party had remained single and unmarried."[4] It does not specify the source of the "means" for acquiring the property. The parties agreed to waive their claims against the other party's separate property.

The question becomes whether, under the prenuptial agreement, the cattle and the farming equipment were Husband's separate property. Husband obviously interprets this provision as meaning that any property purchased during the marriage with separate funds would be considered that party's separate property. Wife does not appear to dispute this interpretation, although the agreement does not clearly state it. Rather, the agreement specifies the disposition only for properties titled in both parties' names.

The evidence showed that the joint bank account held by Husband and his mother was used for their own separate purposes, and was also used as an instrumentality of the parties' farming operation. Husband acknowledged that the funds in the joint account with his mother were commingled with farming operations money. Therefore, under any interpretation of the prenuptial agreement, the funds in the account in the joint names of Husband and his mother were not "separate" property, belonging solely to Husband. Moreover, the cattle, farm equipment, feed, and other items purchased out of that account were purchased for the benefit of the farming operation,

---

[4]Absent a prenuptial agreement, the general rule is that, when property is acquired during the marriage by either or both spouses, and is still owned by either or both spouses when the divorce is granted, it is classified as marital property. *See Humphries v. Humphries*, No. E2000-02912-COA-R3-CV, 2001 WL 825986, at *3 (Tenn. Ct. App. July 23, 2001).

which was operated solely in Wife's name.[5]  It is undisputed that Wife participated in the business with Husband, and that she accompanied him in the purchase and sale of cattle.  *Sickler v. Sickler*, No. 01-A-01-9710-CV-0057, 1999 WL 270186, at \*4-\*5 (Tenn. Ct. App. May 5, 1999) (holding that property which was purchased with the husband's separate funds is marital when it is purchased for the enjoyment and use of both and, therefore, was treated as marital property).  The fact that the farming equipment was listed and depreciated on the parties' joint tax return is further evidence that the property was purchased by the parties with the intent that it be owned jointly, not by Husband alone.[6]  Under all these circumstances, we find that the evidence does not preponderate against the trial court's conclusion that the cattle and farm equipment were jointly held by the parties and subject to equal distribution as marital property under the prenuptial agreement.

Husband next argues that the trial court erred in declining to give him full credit for the value of his separate property that he alleges was taken, discarded, or damaged by Wife while she was in possession of the marital home, property that he claims had a value of some $177,000.  In response, Wife argues that the trial court considered all of the evidence and commented that *both* parties' actions "weighed greatly on the Court's mind in this division [of marital property]."  She asserts that Husband's list of missing property is "suspect," and argues that the photographs she submitted show that Husband's personalty was intact when she moved out, with further corroboration by Stevens.  Thus, Wife argues, the trial court had ample basis for crediting her testimony and declining to hold her responsible for this property.

At trial, each party made allegations that the other had misused, destroyed, or absconded with his or her property.[7]  The trial court's findings on the parties' accusations against one another, each denying any wrongdoing, clearly turned on the trial court's assessment of the credibility of the witnesses.  A trial court's credibility determinations regarding the credibility of the witnesses will not be reversed absent clear and convincing evidence to the contrary.  *Stinson v. Stinson*, 161 S.W.3d 438, 440-41 (Tenn. Ct. App. 2004).

The trial court remarked that the parties' conduct "weighed greatly" in its ultimate decision regarding its distribution of property.  Thus, although it declined to assess responsibility to Wife for the damage to Husband's property, the trial court expressed concern over the conduct of both parties.  From a careful review of the all the evidence, taken as a whole, we cannot conclude that the evidence preponderates against the trial court's decision not to credit Husband for the claimed value of his

---

[5]Although the cattle and farming operation was in Wife's name only, Wife has not appealed the trial court's ruling that it was marital property, to be divided equally.  The trial court made no finding as to why the operation was in Wife's name rather than the parties' joint names.

[6]We are mindful that merely listing property on a joint tax return alone does not transmute separate property into marital property.  *Sickler v. Sickler*, No. 01-A-01-9710-CV-0057, 1999 WL 270186, at \*5 (Tenn. Ct. App. May 5, 1999).

[7]Wife has not appealed the trial court's failure to credit her for the value of items of hers supposedly taken by Husband, such as patio furniture and her share of the funds in the two of their joint bank accounts.

damaged or missing property. Therefore, we affirm the trial court's equitable distribution of the parties' marital property.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Robert Howard Cartwright, Sr., and his surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE