IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
October 25, 2006 Session

**SHARON KAY JACKSON**
**v.**
**RANDALL D. JACKSON**

**An Appeal from the Circuit Court for Shelby County**
**No. CT-002855-03     John R. McCarroll, Jr., Judge**

---

**No. W2006-00182-COA-R3-CV - Filed February 22, 2007**

---

This is a divorce case. The parties had a long-term marriage and their children are now adults. During the marriage, the husband worked in the telecommunications industry and the wife was primarily a homemaker. The parties' marital estate consisted largely of real property. They had incurred a substantial debt to the Internal Revenue Service. After a three-day hearing, the trial court declared the parties divorced and ordered that the real property be sold to satisfy the debt owed to the IRS. The trial court equally divided the IRS debt and any remaining proceeds from the sale of the properties. The trial court also awarded the wife a lump sum judgment representing temporary support during the pendency of the action, ordered the husband to pay the wife transitional alimony for five years, and denied the wife's request for attorney's fees. The wife now appeals the division of the marital estate, the decision to make the alimony award transitional rather than *in futuro*, and the denial of her request for attorney's fees. The husband appeals the amount of the alimony award and the judgment for temporary support awarded to the wife. We modify the alimony to award alimony *in futuro* instead of transitional alimony, and affirm the remainder of the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed in Part, Modified in Part, and Remanded.**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Stuart Breakstone and Kathy Baker Tennison, Memphis, Tennessee, for Plaintiff/Appellant Sharon Kay Jackson.

Charles W. McGhee, Memphis, Tennessee, for Defendant/Appellee Randall D. Jackson.

**OPINION**

Plaintiff/Appellant Sharon Kay Jackson ("Wife") and Defendant/Appellee Randall D. Jackson ("Husband") were married on August 16, 1974. Husband and Wife have three children, all of whom are now adults. When the parties divorced, Wife was 54 years of age and Husband was 53.

Husband is a college graduate and, early in the parties' marriage, he earned a Master's Degree in Business Administration ("M.B.A."). For ten to fifteen years, Husband worked as a sales engineer for several companies in the telecommunications and communications-internet industry. Tax return statements show that Husband's earnings were $72,695 in 1995, $98,054 in 1996, $109,138 in 1997, $338,142 in 1998, $237,356 in 1999, $538,548 in 2000, $164,721 in 2001, and $125,600 in 2002. In May 2003, however, Husband lost his job after a "bust" in the telecommunications industry. Husband's Rule 14(C) Affidavit of Income and Expenses states that, in November 2004, he was self-employed, working as an independent contractor for Tax Break, LLC. The affidavit shows total monthly expenses of $6,196 and an adjusted monthly income of $308.30.

Wife is a high school graduate. In the mid-70's, she earned approximately fourteen credit hours at Delta State University. By agreement of the parties, during the marriage, Wife was primarily a homemaker and cared for the parties' three children. At times, Wife also worked part time; in the late 1980s, Wife sold real estate for a three-year period, and in approximately 1996 or 1997, Wife sold prepaid insurance for one year. In addition, during the marriage, Wife managed the parties' two rental properties—one on Berrydale Avenue ("Berrydale property") and another on Merimac Drive ("Merimac property"). At the time of trial, Wife was self-employed, cleaning houses and one office. Wife filed a Rule 14(C) Affidavit of Income and Expenses on July 14, 2005, reporting monthly expenses of $4,191 and an average monthly income of $720.[1]

Prior to the commencement of this action, the parties' marital estate consisted in large part of real property—the Merimac and Berrydale properties referenced above, as well as the marital home on Monterey Road ("Monterey Property").[2] In addition, the parties owned two vehicles and had bank accounts and retirement accounts, including a Charles Schwab account which Wife valued

---

[1] The July 14, 2005 affidavit was the second affidavit of income and expenses submitted by Wife. An earlier affidavit, filed in November 2004, reflected monthly expenses of $2,324.33 and total monthly earnings of $600.

[2] The parties owned a 75% interest in the Berrydale property. They dispute the values of all of these properties, and the trial court made no findings on their values. The following chart outlines the equity values assigned by each party:

| Real Property | Wife's Value | Husband's Value |
|---|---|---|
| 1. Monterey Property | $425,000 | $525,000 |
| 2. Merimac Property | $63,425 | $53,437 |
| 3. Berrydale Property | $58,500 (75% of equity) | $43,181 (75% of equity) |

at $42,000. The parties also incurred a substantial amount of debt during the marriage. Notably, the record reflects an Internal Revenue Service tax debt ("IRS debt") that, including penalties and interest, amounted to $180,000 at the time of trial.

In 1997, amid disputes concerning finances and allegations of physical and mental abuse, Husband and Wife separated. Wife filed for divorce at that time, but the parties reconciled in 1998. On May 21, 2003, however, Wife filed the complaint for divorce in the instant case. Wife's complaint alleged irreconcilable differences, inappropriate marital conduct, and adultery, and she sought both temporary and permanent spousal support. On June 25, 2003, Husband counter-claimed for divorce, admitting irreconcilable differences but denying the allegations of inappropriate marital conduct and adultery. Husband asserted that Wife was guilty of inappropriate marital conduct and abandonment, and denied that Wife was in need of financial assistance or that he had the ability to pay spousal support.

On September 5, 2003, Husband filed a Petition to Allow Defendant to Obtain Mortgage to Pay Taxes and to Charge Wife With Additional Internal Revenue Service Debt. The petition stated that the parties had not filed income tax returns for the years 1995 to 2002, resulting in overdue payments, penalties, and interest. Husband asserted that, in 2003, he had attempted to settle the debt with the IRS, but his settlement attempt was scuttled when Wife refused to sign the joint tax returns prepared by Husband's accountant. As a result, Husband said, he would have to file separate tax returns, which would increase the tax debt. Husband asked the trial court to charge Wife with the increase in the parties' tax debt, and to allow Husband to mortgage the marital home in order to satisfy the balance owed to the IRS. In an amended petition, Husband proposed that the marital home and the Merimac property be sold and the proceeds applied to the outstanding IRS debt. The trial court did not rule on Husband's petitions prior to the trial. The case was subsequently tried over the course of three days, on July 14, 18, and 28, 2005.

At trial, testimony was presented on the circumstances surrounding the IRS debt. Husband testified that he was unable to file the tax returns for the years in question because Wife disposed of the pertinent financial documents. Husband asserted that Wife would "[t]hrow W2's out" and that he had "actually picked up 1099's out of the garbage." Husband asserted that he went to great lengths to file the parties' financial records, but that Wife destroyed his files in 1997, when the parties separated the first time. Husband claimed that Wife refused to cooperate with him in compiling and preserving the documents necessary to file the past returns.

In response, Wife testified that neither she nor the parties' children had disposed of any financial records. To the contrary, Wife stated, she organized the parties' financial documents, categorizing the documents by year and filing them in boxes. Wife said that, on at least four occasions, she had brought the financial documents to Husband and urged him to file the delinquent tax returns. Regarding her refusal to sign the joint tax returns prepared by Husband's accountant in 2003, Wife explained that she was "afraid" to sign them because she could not trust Husband. She also said that her decision not to sign the joint returns was based on advice of counsel,

communications with two IRS representatives concerning her liability, and discussions with unidentified certified public accountants.

The trial court also heard testimony on both parties' employment status and earning capacity. Regarding Husband, the record indicates that his sales engineering position was terminated nine days after Wife filed her complaint for divorce in May 2003. By that time, however, Husband had already obtained an offer of employment for a position that paid $80,000 per year, with the potential to earn an additional $150,000 per year in bonuses. Husband claimed that this employment offer was withdrawn when the company discovered that Wife's complaint for divorce was based in part on allegations of adultery. Shortly after that, Husband received another offer of employment for a position that paid $90,000 in salary plus commissions. Husband claimed that this job offer was withdrawn because he was unable to get a copy of his military discharge certificate and get it to the potential employer before the job offer expired.

Husband also testified about his health. He said that he began experiencing back problems in August 2003 and that he underwent his second back operation in October 2003. Husband said that he must take pain and muscle-relaxing medications for his back problems. At trial, he asserted that his back problems continued to affect him. At the time of trial, Husband was working as an independent contractor for Tax Break, LLC, a position which paid relatively nominal commissions. He had not obtained regular full-time employment.

At the time of trial, Wife was earning money by performing cleaning services. She testified that she was cleaning houses one day a week and an office one day every two weeks. Wife said that in 1996 or 1997, she had additional housecleaning jobs and earned approximately $1,000 per month.

Wife also testified about the status of her health. She said that she had tested positive for celiac sprue, a disease that prevents the body from absorbing nutrients from certain foods. This condition, she stated, causes her to tire easily. Wife testified that her "physical problems" made it difficult to clean houses and had prevented her from seeking additional cleaning jobs. Wife acknowledged, however, that she had not been told by a physician not to seek additional cleaning jobs or not to renew her real estate license.

Both parties testified about marital funds spent while the divorce proceedings were pending. In his testimony, Husband conceded that, without Wife's consent or an order from the trial court, he had sold the parties' 75% interest in the Berrydale property. Husband received a total of $31,256.33 in net proceeds from the sale. From these proceeds, Husband said that he used $25,000 as repayment for a $50,000 loan he claimed to have obtained from his brother. Husband testified that the remaining proceeds were applied to expenses related to the parties' Merimac property. In addition, Husband conceded that he liquidated the parties' Charles Schwab account. He asserted, however, that the money was used for the parties' medical expenses, mortgage payments, health and car insurance payments, and the like.

In Wife's testimony, she said that she had opened three separate bank accounts without Husband's knowledge or consent and that marital funds were deposited in these accounts. Wife said that she opened an investment account in 1999, in which she deposited $25,000 in marital funds for the purchase of stock. She opened a second investment account in 2000 and deposited $15,317 in marital funds, also for the purchase of stock.

In addition to the investment accounts, Wife opened a savings account. By February 2000, the balance in this savings account had increased to $27,344. As of March 2002, the savings account balance was only $395. In her testimony, Wife claimed to be unable to explain how the monies withdrawn from this account were spent.

Both Husband and Wife testified about their living expenses and attorney's fees incurred during the pendency of the divorce proceedings. Husband said that, in addition to the $50,000 loan from his brother and some of the proceeds from his liquidation of the Charles Schwab account referenced above, he also borrowed a total of $30,000 from relatives and a friend. Wife testified that she lived for several months on the $18,000 remaining balance in the investment account that she opened in 1999.[3] Due to a decline in stock values, by the time Wife filed for divorce, the second investment account was worth less than ten dollars. In addition, Wife asserted that she borrowed approximately $25,450 from various relatives. At the time of trial, Wife said, she was receiving food stamps.

At the conclusion of the testimony, the trial judge issued an oral ruling from the bench. This ruling was memorialized in a Final Decree of Divorce, entered on October 25, 2005, in which the trial court declared the parties divorced pursuant to section 36-4-129 of the Tennessee Code Annotated. Regarding the sizeable IRS debt, the trial court observed: "I can't tell . . . whose fault it was that the returns didn't get filed. I heard [a] completely different story from Ms. Jackson than I heard from Mr. Jackson." Consequently, the trial court divided the IRS debt equally between the parties and ordered that the Monterey and Merimac properties be sold to satisfy this obligation. The trial court also found that both parties had "dissipated" marital assets and that the amounts spent by either party offset and cancelled out the amounts spent by the other. The trial court found, however, that Wife was entitled to receive her $13,000 share of the proceeds from Husband's sale of the Berrydale property. The trial court also ordered that all debts other than the IRS debt be paid by the party who incurred the debt. Each party was awarded the personal property and vehicle in his or her possession.

The trial court also made findings regarding the parties' ability to work and earn money. It found that the reasons Husband offered in his testimony for not being fully employed were not "good enough" reasons to not be working, and concluded that he was underemployed. The trial court found Wife to be an economically disadvantaged spouse. It held that Wife "should have received alimony due to the parties' separation since June of 2003." Based on Husband's earning capacity, the trial

---

[3]The record indicates the parties agreed that Wife could use these marital funds for support during the proceedings.

court set the rate of alimony at $2,500 per month from the date of separation through July 2005, and ordered Husband to pay a total of $62,500 in alimony *pendente lite*, without prejudgment interest. Wife was also awarded transitional alimony for a period of five years in the amount of $2,500 per month, commencing August 1, 2005.

Finally, the trial court ordered that, after satisfaction of the IRS debt from the sale of the Monterey and Merimac properties, the remaining proceeds should be divided equally between the parties. From Husband's share, however, the trial court ordered that Wife receive a total of $75,500, representing her $13,000 share of the proceeds from the sale of the Berrydale property plus the $62,500 judgement for *pendente lite* support, as well as any transitional alimony accrued between August 1, 2005 and the date of the sale of the properties. The trial court declined to make any award of attorney's fees, holding each party responsible for his or her own attorney's fees. Husband was ordered to designate Wife as the sole irrevocable beneficiary under any life insurance policy received through his employment until his alimony obligation is satisfied. From this order, Wife now appeals.

On appeal, Wife argues that the trial court erred in (1) its distribution of the parties' marital estate, considering the duration of the alimony award and the relevant statutory factors; (2) its award to Wife of transitional alimony for a period of five years, rather than alimony *in futuro*, considering the parties' long-term marriage, Wife's employment history, and the other relevant statutory factors; and (3) its failure to award Wife her reasonable attorney's fees. Husband raises issues on appeal as well. Husband argues that the trial court erred in (1) the amount of transitional alimony awarded to Wife and (2) granting Wife a judgment for temporary support from the date of separation to the date of the divorce.

Since this case was tried without a jury, the trial court's findings of fact are reviewed *de novo* with a presumption of correctness, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); ***Berryhill v. Rhodes***, 21 S.W.3d 188, 190 (Tenn. 2000). The trial court's legal conclusions, however, are reviewed *de novo* with no presumption of correctness. ***Taylor v. Fezell***, 158 S.W.3d 352, 357 (Tenn. 2005).

### Marital Assets and Debts

We first address Wife's argument that the trial court erred in its distribution of the marital estate. Our best reconstruction of the record, using Wife's valuations, indicates that the trial court fashioned a near-equal division of the marital estate, at least as to the parties' major assets and liabilities. Taking into account the $180,000 IRS debt, as well as Wife's $13,000 share of the proceeds from the sale of the Berrydale property, the trial court awarded Wife approximately $167,000 and Husband approximately $141,000 of the equity in the parties' real property. In

addition, Husband and Wife each were to keep the vehicles and personal property in their possession, and any remaining marital debts were allocated to the incurring spouse.[4]

In reviewing the trial court's decision on this issue, we are mindful that the division of marital property is not a mechanical process, but rather requires careful consideration of all the relevant statutory factors in Tennessee Code Annotated § 36-4-121(c).[5] *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). The goal is to divide the marital estate equitably between the parties. *Davidson v. Davidson*, No. M2003-01839-COA-R3-CV, 2005 WL 2860270, at *3 (Tenn. Ct. App. Oct. 31, 2005). Accordingly, trial courts are afforded broad discretion in dividing marital property, *Fisher v. Fisher*, 648 S.W.2d 244, 246 (Tenn. 1983), and their decisions will be given "great weight" on appeal. *Ford v. Ford*, 952 S.W.2d 824, 825 (Tenn. Ct. App. 1996); *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996). Thus, we will ordinarily "defer to the trial courts in these matters unless their decisions are inconsistent with the factors in [section] 36-4-121(c) or are not supported by the preponderance of the evidence." *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994) (citing *Barnhill v. Barnhill*, 826 S.W.2d 443, 449-50 (Tenn. Ct. App. 1991)); *see also Mahaffey v. Mahaffey*, 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989).

On appeal, Wife argues that the trial court failed to consider her future needs when dividing the marital estate. She contends that, in light of the "short term alimony award" and all relevant

---

[4] In accordance with Rule 7 of the Rules of the Court of Appeals of Tennessee, Wife attached a statement to her appellate brief setting forth the trial court's distribution of the marital assets and debts. According to this statement, Wife incurred approximately $29,850 and Husband incurred approximately $55,000 in marital debts, not including the IRS debt or the parties' attorney's fees.

[5] The statutory factors are:

(1) The duration of the marriage;

(2) The age, physical and mental health, vocational skills, employability, earning capacity, estate, financial liabilities and financial needs of each of the parties;

(3) The tangible or intangible contribution by one (1) party to the education, training or increased earning power of the other party;

(4) The relative ability of each party for future acquisitions of capital assets and income;

(5) The contribution of each party to the acquisition, preservation, appreciation, depreciation or dissipation of the marital or separate property, including the contribution of a party to the marriage as homemaker, wage earner or parent, with the contribution of a party as homemaker or wage earner to be given the same weight if each party has fulfilled its role;

(6) The value of the separate property of each party;

(7) The estate of each party at the time of the marriage;

(8) The economic circumstances of each party at the time the division of property is to become effective;

(9) The tax consequences to each party, costs associated with the reasonably foreseeable sale of the asset, and other reasonably foreseeable expenses associated with the asset;

(10) The amount of social security benefits available to each spouse; and

(11) Such other factors as are necessary to consider the equities between the parties.

T.C.A. § 36-4-121(c) (2005).

statutory factors, the trial court should have awarded her more of the marital assets and less of the marital debt. Wife insists that Husband is solely at fault for accrual of the IRS debt and that he should suffer the consequences of his failure to file the required tax returns.

We first address the trial court's allocation of the IRS debt. To the extent that accountability factors into a trial court's allocation of marital debt,[6] we note that the record does not conclusively establish that either party is wholly responsible for the failure to file tax returns or pay taxes. The trial court heard conflicting testimony from both parties on this issue, and declined to find the testimony of one party more credible than the testimony of the other. When the resolution of an issue depends upon the truthfulness of the witnesses, the trial judge has the opportunity to observe the witnesses in their manner and demeanor and is in a better position than this Court to decide those issues. *McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997). Simply reading the cold record, we are not in a position to credit Wife's testimony over Husband's testimony regarding the parties' relative responsibility for the IRS debt. Therefore, we cannot conclude that the trial court erred in allocating this debt equally between the parties.

Wife also contends that the trial court failed to divide the parties' marital estate in an equitable manner. Wife correctly notes that, when practical, a court should use the division of property to provide for the disadvantaged spouse's future needs, instead of relying solely on an award of alimony. *Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002) ("We encourage trial courts to use the division of marital property to assist in meeting the disadvantaged spouse's financial needs when feasible."). However, despite a 32-year marriage and significant contributions by each party to the acquisition of the marital assets, by the time of trial, the parties' economic circumstances had significantly deteriorated. Consequently, at that point, neither party was in a position to repay the marital debts, particularly the $180,000 owed to the IRS. It is clear that Husband, with at least fifteen years' work experience and an M.B.A., is in a better position than Wife to adjust to the economic consequences of this divorce. Nevertheless, it is undisputed that he had suffered setbacks, both from his health and from changes in the industry in which he had been employed. Both parties needed the accumulated debt eradicated and a modest sum for transition. Therefore, we find that the trial court was within its discretion to distribute the marital estate in order to accomplish this goal, and to address Wife's need for future financial assistance by an award of alimony. Accordingly, we find no error in the trial court's division of the marital property and its allocation of the marital debt.

**Alimony**

The next issue concerns the trial court's award of "transitional" alimony to Wife. Wife argues that the trial court erred in awarding her spousal support for five years and asserts that she is

---

[6]Trial courts have the authority to equitably distribute marital debts in the same manner that they apportion marital assets. *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995). Trial courts must consider the following "four factors . . . in the equitable distribution of marital debt: (1) the debt's purpose; *(2) which party incurred the debt*; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003) (emphasis added).

entitled to an award of alimony *in futuro* or, in the alternative, an award of alimony until she reaches the age of retirement. Husband maintains that Wife is not entitled to alimony *in futuro* and contends that the amount of monthly support awarded should be reduced to more accurately reflect Wife's needs.

As with the division of marital property, trial courts are afforded wide latitude in deciding whether spousal support is warranted and in determining the type, amount, and duration. ***Bratton v. Bratton***, 136 S.W.3d 595, 605 (Tenn. 2004); ***Jones v. Jones***, 784 S.W.2d 349, 352 (Tenn. Ct. App. 1989). As a result, we are not inclined to alter spousal support decisions absent an abuse of discretion. ***Goodman v. Goodman***, 8 S.W.3d 289, 293 (Tenn. Ct. App. 1999) (citing ***Ingram v. Ingram***, 721 S.W.2d 262, 264 (Tenn. Ct. App. 1986)); ***see also Hanover v. Hanover***, 775 S.W.2d 612, 617 (Tenn. Ct. App. 1989).

There are four types of alimony to be awarded to an economically disadvantaged spouse: rehabilitative alimony, transitional alimony, alimony *in futuro*, and alimony *in solido*. Each type addresses a specific need. Rehabilitative alimony is temporary support intended to assist the economically disadvantaged spouse in obtaining the education or training necessary to allow him or her to achieve a reasonable standard of living in comparison to the standard of living maintained by the parties during the marriage, or to the post-divorce standard of living available to the other spouse. T.C.A. § 36-5-121(e)(1) (2005). Where rehabilitation is not necessary, transitional alimony may be awarded to assist the disadvantaged spouse in adjusting to the economic consequences of the divorce. T.C.A. § 36-5-121(g)(1).

Alimony *in futuro* and alimony *in solido* are long term forms of spousal support. T.C.A. § 36-5-121(f)(1), (h)(1). Alimony *in futuro* is typically awarded when a spouse is economically disadvantaged, but rehabilitation is not feasible—i.e., the disadvantaged spouse cannot achieve an earning capacity that will allow him or her to maintain an appropriate standard of living. T.C.A. § 36-5-121(f)(1). This type of alimony is awarded on a "long term basis or until death or remarriage of the recipient" spouse. T.C.A. § 36-5-121(f)(1). Alimony *in solido*, on the other hand, is a lump sum award of alimony, but it may be paid in installments over a specific period of time. T.C.A. § 36-5-121(h)(1). Courts typically award this type of alimony to adjust the division of marital property, ***Burlew v. Burlew***, 40 S.W.3d 465, 471 (Tenn. 2001), or to assist the disadvantaged spouse in paying attorney's fees. ***Koja v. Koja***, 42 S.W.3d 94, 98 (Tenn. Ct. App. 2000).

The pertinent statutes indicate a clear legislative preference for rehabilitative alimony. T.C.A. § 36-5-121(d)(2) ("It is the intent of the general assembly that a spouse, who is economically disadvantaged relative to the other spouse, be rehabilitated, whenever possible."). The purpose of such an award is to encourage and aid the economically disadvantaged spouse in becoming more self-sufficient. ***Burlew***, 40 S.W.3d at 471. As indicated above, however, where the disadvantaged spouse is not capable of economic rehabilitation sufficient to support a reasonable standard of living under the circumstances, the court may award long-term spousal support. T.C.A. § 36-5-121(d)(3); ***see also Anderton v. Anderton***, 988 S.W.2d 675, 682 (Tenn. Ct. App. 1998) ("The statutory

preference for rehabilitative support does not entirely displace other forms of spousal support when the facts warrant long term or more open-ended support.").

In order to decide whether an award of alimony is appropriate and, if so, to determine the type, amount, and duration of the award, trial courts are required to balance the relevant statutory factors set forth in Tennessee Code Annotated § 36-5-121(i).[7]  Among these factors, the most important are the need of the disadvantaged spouse and the ability of the obligor spouse to pay. *Anderton*, 988 S.W.2d at 683; *see also Evans v. Evans*, No. M2002-02954-COA-R3-CV, 2004 WL 1514843, at *5 (Tenn. Ct. App. July 6, 2004).  The statutes specifically address the situation in which one spouse has been a homemaker rather than working outside the home:

> [T]he contributions to the marriage as homemaker or parent are of equal dignity and importance as economic contributions to the marriage. Further, where one (1) spouse suffers economic detriment for the benefit of the marriage, . . . the economically disadvantaged spouse's standard of living after the divorce should be reasonably comparable to the standard of living enjoyed during the marriage or to the

---

[7]This section provides that:

(i) In determining whether the granting of an order for payment of support and maintenance to a party is appropriate, and in determining the nature, amount, length of term, and manner of payment, the court shall consider all relevant factors, including:

(1) The relative earning capacity, obligations, needs, and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(2) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earnings capacity to a reasonable level;

(3) The duration of the marriage;

(4) The age and mental condition of each party;

(5) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(6) The extent to which it would be undesirable for a party to seek employment outside the home, because such party will be custodian of a minor child of the marriage;

(7) The separate assets of each party, both real and personal, tangible and intangible;

(8) The provisions made with regard to the marital property, as defined in § 36-4-121;

(9) The standard of living of the parties established during the marriage;

(10) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(11) The relative fault of the parties, in cases where the court, in its discretion, deems it appropriate to do so; and

(12) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

T.C.A. § 36-5-121(i) (2005).

-10-

post-divorce standard of living expected to be available to the other spouse, considering the relevant statutory factors and the equities between the parties.

T.C.A. § 36-5-121(c)(2). Thus, in making alimony decisions, the courts are obliged to consider both parties' standards of living, both during the marriage and post-divorce, where one spouse, as the homemaker or parent, has focused his or her efforts on the family, while the other spouse has pursued a career. *Goodman v. Goodman*, No. M2004-02781-COA-R3-CV, 2006 WL 47359, at *4, *5 n.2 (Tenn. Ct. App. Jan. 9, 2006); *see also Morrow v. Morrow*, No. M2003-02448-COA-R3-CV, 2005 WL 1656825, at *8 (Tenn. Ct. App. July 14, 2005).

We consider first Wife's contention that the alimony awarded should have been *in futuro* rather than transitional for a five-year period. This was a long-term marriage, during which, by joint agreement of the parties, Wife focused on caring for the parties' three children and being a homemaker. Wife worked outside the home, part-time, for relatively brief periods. At the time of trial, Wife was 54 years of age, had never obtained a college degree, and had an insubstantial amount of work experience. By the time of trial, Wife was performing cleaning services and earning approximately $720 per month. The trial court specifically considered Wife's contributions as a homemaker and found her to be economically disadvantaged; Husband does not dispute this finding on appeal.

In the meantime, also by agreement of the parties, Husband focused his efforts on his career. During the marriage, he earned an M.B.A. and gained at least fifteen years of work experience. From 1995 to 2002, Husband's earnings averaged approximately $210,000 per year. Although Husband had obstacles such as adverse conditions in the telecommunications industry and back problems, the trial court found that Husband's explanation for being only partially employed at the time of trial was not "good enough." The trial court concluded that Husband was underemployed, and Husband does not appeal that finding. The trial court noted Wife's assertion that Husband had an earning capacity of $145,000 per year, his average income for the two years preceding the trial. Husband clearly has marketable skills and the ability to earn a substantial income, and the considerable disparity in the parties' respective earning capacities is apparent.

In his oral ruling, the trial court initially stated that Wife "should receive some alimony in the future for a period of five years." The trial judge did not categorize the alimony award at that point. Later, counsel for Wife asked the trial court to categorize the alimony:

| [COUNSEL FOR WIFE]: | Also, your Honor, I would ask that you call that transitory [transitional] alimony which can't be modified. You didn't actually described the — |
|---|---|
| THE COURT: | Okay. |

On appeal, Husband contends that "counsel for Wife . . . specifically requested that the alimony be transitional," and requests that "[s]ince the Trial Court awarded alimony for a period of years, the Trial Court found Wife capable of rehabilitation." We cannot conclude, however, that the trial

court's award of transitional alimony included an implicit finding that Wife was "capable of rehabilitation." Indeed, from our review of the record, there was no evidence on which such a finding could be based. There was no evidence at trial of potential training or education to increase Wife's earning capacity, except for Husband's rather hopeful suggestion that Wife could revive a long-dormant real estate license. At age 54, with little education or marketable work experience, there is no substantial evidence that Wife can secure employment any more lucrative than cleaning houses.

The trial court did not explain its reasoning for limiting the alimony award to a period of five years, and the reasons are not apparent from the record. It is unclear from the record how Wife will support herself once the period of transitional alimony ends; the division of marital property is sufficient for Wife to acquire new housing, transportation, and other items necessary to transition from the marriage, but is insufficient to pay for Wife's living expenses after the alimony ends, or for her eventual retirement. The record includes no evidence from which it can reasonably be concluded that Wife will be able to achieve an earning capacity, now or in the future, that will afford her an appropriate standard of living relative to Husband, considering all the relevant statutory factors in section 36-5-121(i).

The statutes provide that where one spouse has suffered economic detriment for the benefit of the marriage, the economically disadvantaged spouse's standard of living "should be reasonably comparable to the standard of living enjoyed during the marriage or to the post-divorce standard of living expected to be available to the other spouse." T.C.A. § 36-5-121(c)(2). Under the circumstances, we must conclude that there is no evidence in the record indicating that Wife is capable of earning an income sufficient to afford her a standard of living which is reasonable in comparison to the parties' standard of living during the marriage or Husband's likely post-divorce standard of living. Consequently, we must conclude that the trial court abused its discretion in ending the alimony payments after five years, and that Wife has demonstrated a need for alimony *in futuro*.

Husband appeals the amount of monthly support awarded to Wife. He argues that $2,500 per month is excessive in light of Wife's reported monthly expenses and income. We disagree.

On July 14, 2005, Wife filed an affidavit of expenses and income, reporting a monthly deficit of $3,471. As noted by Husband, this affidavit included a category of "anticipated" expenses. Husband contends that there was no testimony by Wife at trial regarding the "anticipated" expenses and that consequently these expenses should not be considered in assessing Wife's need. To the contrary, Wife testified that she assisted in the preparation of the July 2005 affidavit and that it accurately reflected a reasonable assessment of her monthly income and expenses. There was, however, no testimony to rebut Wife's assertion regarding her "anticipated" expenses. Husband also contends that some of the expenses reported on the July 2005 affidavit are unfounded; for instance, Husband notes that Wife's affidavit includes expenses related to the maintenance of the Monterey property, which is to be sold in accordance with the trial court's division of the marital estate. Husband fails to take into account, however, that as a result of the trial court's order, Wife

will incur similar expenses in securing and maintaining a new place of residence. We agree with the trial court's finding that Wife established a need for alimony in this amount.

Moreover, the trial court found that Husband had the ability to pay. The trial court found that Husband was underemployed, and stated that the amount of alimony awarded was based on Husband's earning capacity. The evidence in the record supports the trial court's implicit finding that Husband has the ability to pay the amount of alimony awarded.

Accordingly, the trial court's decision to award Wife "transitional" alimony for five years is modified to award Wife alimony *in futuro* in the amount of $2,500 per month. The cause must be remanded to consider matters related to this modification, such as the order on Husband's life insurance. Husband may, of course, seek a modification of the amount of alimony *in futuro* based on future events, such as Wife's receipt of social security benefits.

### *Pendente Lite* **Alimony**

Next, Husband appeals the trial court's decision to award Wife a judgment of $62,500, representing temporary or *pendente lite* spousal support payments in the amount of $2,500 per month from June 2003 to July 2005. Husband, citing section 36-5-121(b) of the Tennessee Code Annotated,[8] first asserts that the trial court erred in awarding Wife a judgment for temporary support because, prior to the trial, no hearing was held regarding temporary support. Husband also contends that the trial court's finding on this issue is unsupported by the evidence. Specifically, Husband asserts that *pendente lite* support was unwarranted because, during the period of time after the filing of the complaint but before the trial, Wife was earning $720 per month, and also because the parties agreed that Wife could use the remaining $18,000 in her investment account for her living expenses. We disagree with both of these arguments.

First, as to a hearing on the issue of temporary support, the parties presented three days' worth of testimony and exhibits to the trial court in this matter, a substantial part of which related to Wife's financial needs and Husband's ability to pay. Second, the evidence in the record establishes that Wife had a need for temporary financial support during the interim leading up to the date of the trial. Despite Wife's access to the approximately $18,000 in marital funds in the investment account, and her meager monthly earnings, Wife incurred considerable debts during these

---

[8]This section provides:

The court may, in its discretion, at any time pending the final hearing, upon motion and after notice and hearing, make any order that may be proper to compel a spouse to pay any sums necessary for the support and maintenance of the other spouse, to enable such spouse to prosecute or defend the suit of the parties and to make other orders as it deems appropriate. Further, the court may award such sum as may be necessary to enable a spouse to pay the expenses of job training and education. In making any order under this subsection (b), the court shall consider the financial needs of each spouse and the financial ability of each spouse to meet those needs and to prosecute or defend the suit.

T.C.A. § 36-5-121(b) (2005).

proceedings. By the time of trial, Wife presented unrebutted testimony that she was receiving governmental assistance to supplement her income. Moreover, during this time, Husband was utilizing a larger portion of the parties' marital funds to pay for his living expenses.

In the alternative, Husband argues that the trial court erred in determining the amount of the temporary support necessary to sustain Wife's needs pending the trial. Husband maintains that the award should be calculated using the monthly deficit reflected on Wife's first Rule 14(C) affidavit, filed in November 2004. Using these figures, Husband contends that the judgment would amount to $41,975. From this amount, Husband also avers that any marital funds Wife used for support and expenses during the proceedings should be deducted. Again, we must disagree.

First, we note that there is substantial evidence showing that both parties depleted marital funds and property pending the trial; in fact, the evidence seems to indicate that Husband depleted more of the marital funds than did Wife. The trial court found that each party's depletion of marital funds offset and "cancelled out" the other's similar depletion. Moreover, by the time of trial in this case, the trial court had before it both of Wife's affidavits of income and expenses, as well as testimony and other proof regarding Wife's financial status during the pendency of this action. From our overall review of the record, we cannot say that the trial court abused its discretion in setting the amount of temporary support at $2,500 per month.

Accordingly, the trial court's decision to award Wife a judgment in the amount of $62,500 for temporary support is affirmed.

### Attorney's Fees

Finally, Wife asserts that the trial court erred in refusing to award her reasonable attorney's fees. In a divorce proceeding, the decision to award attorney's fees is largely within the discretion of the trial court and will not be overturned absent an abuse of discretion. *Smith v. Smith*, 984 S.W.2d 606, 610 (Tenn. Ct. App. 1997). As a general rule, such an award is appropriate only when a spouse lacks sufficient funds to pay his or her own legal expenses or when the payment thereof would deplete his or her resources. *Id.* (citing *Brown v. Brown*, 913 S.W.2d 163, 170 (Tenn. Ct. App. 1994)); *see also Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992).

In the instant case, Wife submitted an affidavit showing a total of $18,092.50 in attorney's fees and expenses. From the division of the marital estate, Wife will receive approximately $167,000 in proceeds from the sale of the parties' real property. In addition, Wife was awarded a judgment for temporary support in the amount of $62,500, to be paid out of the equity in the parties' real property. Under these circumstances, we find no abuse of discretion in the trial court's decision to deny Wife's request for reasonable attorney's fees.

**Conclusion**

For the above-mentioned reasons, we affirm the trial court's division of the marital estate, the award of $62,500 to Wife for *pendente lite* support, and the decision to deny Wife's request for reasonable attorney's fees. The award of alimony is modified to reflect an award of alimony *in futuro* to Wife in the amount of $2,500 per month. This case is remanded for any necessary further proceedings.

The decision of the trial court is affirmed in part, modified in part, and remanded for further proceedings consistent with this opinion. Costs of this appeal are to be taxed to Defendant/Appellee Randall D. Jackson, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE